Arie Mack **MOORE** et al., Plaintiffs-Appellants,

v.

**JAS. H. MATTHEWS & CO.,** et al., Defendants-Appellees.

No. 71–2186.

United States Court of Appeals, Ninth Circuit.

Nov. 29, 1972.

As Amended Jan. 24, 1973.

Roger Tilbury (argued), Henry Kane, of Tilbury & Kane, Portland, Or., Edward Ray Fechtel, of Husband, Johnson & Frye, Eugene, Or., for appellants.

John Gordon Gearin (argued), of Gearin, Hollister & Landis, Portland, Or., Norman Wiener (argued), of Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., Michael Walsh (argued), of Shuler, Rankin, Myers, Walsh & Ragen, Portland, Or., James C. Dezendorf, George L. Wagner, of McColloch, Dezendorf, Spears & Lubersky, Portland, Or., Robert W. Hill, of Hill & Schultz, Eugene, Or., Windsor Calkins, John Luvaas, Paul Clayton, Eugene, Or., for appellees.

Before HUFSTEDLER and CHOY, Circuit Judges, and SCHNACKE,* District Judge.

HUFSTEDLER, Circuit Judge.

Appellants ("Moore"), who are cemetery monument dealers in Eugene, Oregon, brought an antitrust action seeking an injunction and damages against eight Oregon cemeteries ("Cemeteries") and Jas. H. Matthews & Co. ("Matthews"), a manufacturer of bronze grave markers. Moore alleged a conspiracy among Cemeteries and Matthews to restrain trade, monopolization, and attempts to monopolize the grave marker business in the Eugene Area, and illegal tying arrangements in the marketing of grave markers in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).[1]

After Moore's opening statement and before his first witness had completed his testimony and after appellees, over protest, had presented a fragment of their case, the court invited appellees to move for directed verdicts and summary judgment. The court granted the motions, and Moore appeals from the resulting judgment.

Although the district court variously referred to directed verdicts,[2] dismissal

---

* Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

1. Moore has not relied on § 3 of the Clayton Act (15 U.S.C. § 14).

2. As Professor Moore has observed, "it will be an extraordinary case" where a verdict can be properly directed after an opening statement and before the close of evidence by the party against whom the motion is made. (5A J. Moore, Federal Practice) (2d ed. 1971) ¶ 50.02, at 2317.) This was not such a case.

under Rule 41(b),[3] and summary judgment, the foundation of the disposition was the court's conclusion that there was no triable issue of fact and that the allegations of the pleadings, the evidence before the court, and the promises of evidence recited in appellants' opening statement were insufficient as a matter of law to warrant any relief.

■ Summary judgment is available only where no material issue of fact remains for the jury and where the moving party is entitled to judgment as a matter of law. Industrial Building Materials, Inc. v. Interchemical Corp. (9th Cir. 1970) 437 F.2d 1336. (*See also* Fed.R.Civ.P. 50.) The Supreme Court has cautioned specifically and repeatedly against the use of summary procedures in antitrust litigation. Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc. (1969) 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658; Poller v. Columbia Broadcasting System (1962) 368 U.S. 464, 82 S.Ct. 486, 7 L. Ed.2d 458. In *Poller*, the Court closely considered the standard for granting summary judgment in antitrust cases and said that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." 368 U.S. at 473, 82 S.Ct. at 491.

The complaint contained allegations that were sufficient to state claims for relief based on violations of the Sherman Act, sections 1 and 2 (15 U.S.C. §§ 1, 2).

■ Concerted action involves an agreement between the parties, but the agreement can be tacit as well as express. (Theatre Enterprises v. Paramount Film Distributing Corp. (1954) 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273.) Mere parallelism or fraternization does not establish an agreement (Cement Manufacturers Protective Ass'n v. United States (1925) 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104), but an agreement may be implied from conformity to a contemplated pattern of conduct. (United States v. General Motors Corp. (1966) 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415; Interstate Circuit, Inc. v. United States (1939) 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; *see also* United States v. Twentieth Century-Fox Film Corp. (S.D.Cal.1956) 137 F.Supp. 78.) In *Interstate Circuit*, the Court held that "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." 306 U.S. at 227, 59 S.Ct. at 474.

■ Moore's first witness testified to facts which, if credited, would support a finding by the jury that Cemeteries had visited upon Moore the requisite competitive injury.[4]

In his opening statement Moore said that he would prove that Matthews distributed its handbook ("Modern Cemeteries") to Cemeteries promising, in effect, that Cemeteries could eliminate

---

3. The court's mention of Rule 41(b) was in the context of an expression of dissatisfaction by the court with the failure of appellants' counsel to satisfy the court's directive that he "be specific about proof of a conspiracy." The record would not have supported an order for sanctions.

4. Moore testified that while his sales in nondefendant cemeteries stayed about the same between 1965 and 1970, the following pattern took place in those cemeteries joined in the instant case:

| Year | Interments in Cemeteries | No. of markers sold by Moore to Cemeteries |
|------|--------------------------|--------------------------------------------|
| 1965 | 833 | 202 |
| 1966 | 869 | 209 |
| 1967 | 861 | 242 |
| 1968 | 892 | 166 |
| 1969 | 995 | 70 |
| 1970 | 950 | 10 |

competition and thereby gain monopolistic profits by following the suggestions contained in the booklet.[5] "Modern Cemeteries," admitted as an exhibit, contains numerous suggestions for exclusionary rules and rules subject to exclusionary application.[6] He said that the evidence would show that, in response to the circulation of "Modern Cemeteries," every one of the Cemeteries enacted rules and developed practices designed to exclude Moore. He said he would introduce evidence to prove that Matthews supports this object and that various meetings and consultations with representatives of Matthews took place in furtherance of the conspiracy.[7]

Moore's pretrial discovery indicates that certain of the Cemeteries adopted a rule or practice of absolute exclusion of outside markers (others require written approval of outside markers) and that some of the Cemeteries have established specific alloy content rules for markers set on their grounds that are identical or very similar to Matthews' formula as specified in "Modern Cemeteries." [8]

Moore stated that he would prove that some of the Cemeteries adopted a pricing formula recommended by Matthews' salesmen.[9] He promised to prove that all Cemeteries prohibit installation of markers except by their own personnel, even though it is a routine, unskilled

---

5. "You can monopolize all of the sales of markers and monuments in your cemetery. No one else can get a sale."

6. "Modern Cemeteries" states, in part: "No person outside the organization or a lot owner establishes any right to question any reasonable Rule or Regulation which has been established. Nor can they be questioned by any supplier or competitor in the Cemetery Industry." P. 6.
   "26. No person other than the proper employees of the Cemetery shall be allowed to perform any work within the Cemetery without a written permit from the authorized Officers of the Cemetery." P. 15.
   "8. Plans or sketches, with measurements, descriptions and specifications of all stonework or bronze to be placed in the Cemetery, must be submitted to the Management for examination and written approval before a foundation order for the work will be accepted; and in the case of monuments, memorials and mausoleums, detailed specifications must accompany the plans." P. 18C.
   "11. The Management reserves the exclusive right to reject all work which, on account of design, workmanship, materials or faults of any kind, is in its opinion unsatisfactory.
   "12. All foundations of any kind shall be installed by the Cemetery, the charges for which shall be reasonable and payable in advance." P. 18C.
   "16. Granite is the only kind of stone permitted for markers or monuments. The use of any other material except approved bronze shall not be permitted." P. 18C.

"25. All monuments, markers and memorials which do not conform to the rules and regulations in sections in which they are placed will be removed." P. 18D.
   "29. Cleaning of memorials by outside firms is not permitted." P. 18D.

7. He referred to contact through the mail, telephone calls, and visits of Matthews field representatives. Several exhibits resulting from pretrial discovery do indicate communication between some Cemeteries on the "Mack Moore problem." One affidavit asserts that the attorney for three of Cemeteries stated, "You can tighten up your rules and regulations so that Mack Moore will never have a sale of a marker or monument to go in your cemetery."

8. The precision of the matching prescribed formulas may permit an inference of tacit agreement. "Modern Cemeteries" specifies that "the Bronze Alloy used in creating the memorial shall consist of:
   Not less than ........ 87% Copper
   Not less than ......... 5% Tin
   Not more than ...... 2½% Lead
   Not more than ......... 5% Zinc
   All other elements in total
   not to exceed ........ 1% "
   Moore's first witness testified that in certain cases Moore's deliveries of non-Matthews bronze markers were repeatedly rejected as substandard.

9. "[Two cemeteries admit they have this rule or formula and three more deny that they had it.] But we're going to prove to you that they had it, and we're going to prove to you that they had it with their own documents and with their own writing and with their own admissions."

task. Moore's first witness testified to several specific occasions when particular cemeteries refused to accept Moore's markers where they were sold directly to lot owners.

■ He said that he could prove that the motivation for the individual and joint actions of Cemeteries was monopolization and elimination of Moore as a competitor. Direct proof of such subjective intent is rarely possible. Findings must be largely based on inferences that the jury may appropriately draw from the direct evidence.

The facts disclosed by discovery, the partial testimony of Moore's first witness, and the proof promised in the opening statement, fragmentary though it be, is enough to prevent summary judgment.

■ Of course, Moore must fulfill his promises of proof if he is to prevail. If proof is thus adduced, the jury could infer that appellees conspired to fix prices and to subject Moore to a group boycott, both of which are per se violations of the Sherman Act. (United States v. Socony-Vacuum Oil Co. (1940) 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Fashion Originators' Guild of America, Inc. v. Federal Trade Commission (1941) 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949.) The jury might find a tacit conspiracy in response to Matthews' "invitation" or an overt conspiracy. In either case, no formal agreement is necessary and the jury may infer agreement from business behavior. (*See Norfolk Monument, supra*, 394 U.S. at 704, 89 S.Ct. 1391, 22 L.Ed.2d 658, and cases cited therein.)

■ Moore has also alleged monopolization and attempts to monopolize. Monopolization, proscribed by section 2 of the Sherman Act, occurs when an individual or group uses market power to control prices or to control or to exclude competitors. United States v. E. I. DuPont De Nemours & Co. (1956) 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. The conduct supporting a cause of action for conspiracy under section 1 may also support a claim under section 2.

Although evidence submitted under a section 1 claim is also relevant to a section 2 claim, there are important distinctions between them.

First, section 2 is not limited to concerted activity. A jury, therefore, could find that individual actions undertaken by one or more of the Cemeteries or by Matthews constituted monopolization or attempted monopolization violating section 2, even if it found no concerted activity.

Second, Moore must prove that one or more of the appellees possessed the necessary market power to produce the unlawful result. Moore's assertions, if true, that Cemeteries are the eight primary cemeteries in the Eugene area and that they together account for 72 percent of the burials in Lane County and that Matthews is the largest manufacturer of bronze cemetery markers in the United States, producing 65 to 70 percent of such markers, are adequate to raise a genuine issue of fact about market power of these appellees.

■ Finally, this court has ruled that an attempt to monopolize under section 2 does not require proof of monopoly power. Proof that there is a "dangerous probability of success" is certainly enough. Lessig v. Tidewater Oil Co. (9th Cir. 1964) 327 F.2d 459. Evidence of market power is relevant, but not indispensable to a *Lessig* claim.

■ Moore also claimed that defendants have engaged in illegal tying policies. Tying arrangements, whereby a seller agrees to the sale of his product only on the condition that the buyer purchases a second product (or service) from the seller, are illegal under section 1 of the Sherman Act. International Salt Co. v. United States (1947) 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, appeal dismissed, 332 U.S. 747, 68 S.Ct. 26, 92 L.Ed. 335. Taken as true, Moore's factual showings establish numerous inci-

dents of tying arrangements. Where such practices are uniform or similar or established as a response to an "invitation to conspire," they constitute strong evidence of a combination or conspiracy in restraint of trade under Sherman Act § 1. (*See* Interstate Circuit, Inc. v. United States, *supra*, 306 U.S. at 223, 59 S.Ct. 467, 83 L.Ed. 610.) Section 1 also prohibits "contracts" that restrain trade; forbidden tying arrangements are contracts that may violate section 1 even if there is no other joint action.

There was some evidence from which a jury could have found that some or all of Cemeteries have established policies or practices tying the sale of a cemetery lot to the purchase of a marker or tying the sale of a lot to installation of a marker in violation of section 1. Moore asserts in an affidavit that one cemetery's practice changed twice in the period covered by the pleadings—first to a policy prohibiting outside installation of markers, then to a policy requiring that all markers be purchased from the cemetery. In another case, Moore's response to an interrogatory includes an attached letter from one cemetery demanding that Moore not solicit "our families" and stating that their policy is for the customer to sign an agreement to purchase all monuments from the cemetery. Similar evidence is presented with respect to the practices of other Cemeteries. This evidence was adequate to foreclose summary judgment on the tying theory.

Here, as in *Poller, supra*: "It may be that upon all of the evidence a jury would be with the respondents. But we cannot say on this record that 'it is quite clear what the truth is.'" (368 U.S. at 472, 82 S.Ct. at 491. *See also* Kennedy v. Silas Mason (1948) 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347.)

Reversed and remanded.

SCHNACKE, District Judge (concurring specially):

I concur in the conclusion that summary judgment was inappropriate in the situation as it stood when the court below ruled.

Provisions of the Federal Rules could have been invoked at earlier stages of the proceedings. Counsel for Moore had repeatedly failed to supply specifics prior to the trial, although repeatedly admonished to do so. Yet no sanctions for such failure were sought and none was imposed. The court contented itself with warnings and threats that were never carried out. Thus the trial commenced without pretrial presentation of the facts and issues and the court belatedly cast about for some appropriate form of meting out sanctions—hence the confusing remarks about just what the court was doing. None of the rulings proper at that stage fit the situation. It was too early to grant a directed verdict under Rule 50(a). or a Rule 41(b) dismissal, since plaintiffs had not completed their case. Summary judgment was out of time, it being the clear intendment of Rule 56 that it be invoked prior to the commencement of a trial—in fact it is a form of substitute for a trial.

I think it unnecessary to decide whether there has been any indication of plaintiffs' ability to adduce proof sufficient to go to the trier of fact.

All I would hold is that the court's justifiable vexation with the pretrial conduct of Moore's counsel in repeatedly failing to define or bring forth proof of their contentions might have been dealt with by sanctions under Rule 37, but having let the case proceed to trial, the court could not make the summary disposition it attempted here.