Joe **DOBBINS** et al., Plaintiffs,

v.

**KAWASAKI MOTORS CORPORATION,
U. S. A., a Delaware corporation, and
Kawasaki Heavy Industries, a Japanese
corporation, Defendants.**

**KAWASAKI MOTORS CORPORATION,
U. S. A., a Delaware corporation,
Counterclaimant,**

v.

**JOE DOBBINS IMPORTS, INC., an Oregon corporation, and Joe Dobbins,
Counterclaim-Defendants.**

**Civ. No. 71–105.**

United States District Court,
D. Oregon.

June 15, 1973.

Bruce M. Hall, Hall & Novack, Hardy Myers, Jr., George K. Meier, III, Patrick J. Simpson, Rives, Bonyhadi & Drummond, Portland, Or., for plaintiffs, and for counterclaim-defendants.

Barnes H. Ellis, Charles F. Hinkle, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., William B. Campbell, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant Kawasaki Motors Corp., U.S.A.

Wayne Hilliard, Stanley R. Loeb, Dezendorf, Spears, Lubersky & Campbell, Portland, Or., for defendant Kawasaki Heavy Industries.

## OPINION AND ORDER

SKOPIL, District Judge:

Defendant Kawasaki Motors Corporation, U.S.A. (KMC) has moved under

Rule 56 for partial summary judgment. Plaintiffs have also moved for partial summary judgment against KMC. Defendant Kawasaki Heavy Industries (KHI), a Japanese corporation, has moved under Fed.R.Civ.P. 12(b)(2) and (3) to dismiss this action as to it for lack of jurisdiction and improper venue.

Summary judgment is, of course, only available where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law. Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1970). Courts must especially be careful in employing summary judgment in antitrust litigation where it may be important for witnesses to be present and subject to cross-examination. A trial may offset the plaintiffs' problems of proof in such cases where motive and intent are important. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 330 (9th Cir. 1973).

I

KMC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This motion involves four requests:

1) Summary judgment as to all claims arising on or prior to September 18, 1969, on the ground that plaintiff Joe Dobbins executed a release on that date for such claims for which he was paid $43,000;

2) If (1) is denied, summary judgment in the alternative for all claims arising on or prior to February 27, 1967, on the ground that Dobbins released defendant from such claims for which he received a consideration of $10,000 credit on purchases of new motorcycles;

3) Summary judgment on plaintiffs' allegations of monopoly and conspiracy to monopolize, which are plaintiffs' counts (15) through (19), on the ground that KMC's actual or potential market share in the relevant market is, as a matter of law, insufficient to constitute a monopoly; and

4) Summary judgment as to plaintiffs' allegations of discrimination on the ground that plaintiffs have failed to allege facts sufficient to constitute a claim.

A. *The Releases.*

In September, 1969, Joe and Jerry Dobbins negotiated a new Kawasaki motorcycle distributorship contract with KMC officers, Alan Masek, Tony Watanabe, and Y. Hamawaki, in Los Angeles. Part of that discussion was an attempt to resolve previous differences. As a result of those discussions, Joe Dobbins was sent a new distributorship contract, a letter which contained the release, and a check for $43,000. Dobbins signed the distributorship agreement and negotiated the check. The pertinent language of the release is:

This letter will serve as our agreement to settle ALL OUR PROBLEMS past and present as we discussed in Los Angeles on Monday, 8 September. Acceptance of the enclosed check and its endorsement are your agreement to this letter embodying our settlement and the terms of the settlement. The endorsement of the check constitutes your full and complete release of all past and current claims of every kind, including, but not limited to, territory compensation, ending our present distributorship agreement earlier than its present terms, all of your efforts in developing Kawasaki business in the United States, all of Gerry [sic] Dobbins' efforts in developing the Kawasaki motorcycle product.

It is KMC's contention, essentially, that this agreement is a valid contract, entered into by parties dealing at arms' length, and that it is binding upon the plaintiffs as to claims, including antitrust claims, which arose on or before September 18, 1969, the date of the check.

Normally there is a presumption in favor of the validity of releases, and

courts may give them effect by means of summary judgment, even in antitrust cases. Suckow Borax Mines Consol., Inc. v. Borax Consol., Ltd., 185 F.2d 196, 205 (9th Cir. 1950). Plaintiffs here, however, attempt to avoid the effect of this release by contending that the release itself was "part and parcel" of KMC's antitrust scheme.

There are two principal aspects of plaintiffs' attack on the release:

1) A release which aids a combination to restrain trade or which forms a part of the means by which the illegal objectives of the combination or contract are sought to be achieved, is itself unlawful and void; and

2) The nexus between the release and the broader alleged unlawful combination or contract under the Sherman Act is a factual question which should wait the trial for determination.

Contrary to plaintiffs' assertion, Radio Corp. of America v. Raytheon Mfg. Co., 296 U.S. 459, 56 S.Ct. 297, 80 L.Ed. 327 (1935), does not support their argument. The question was whether, under the circumstances, the validity of a release pleaded by a defendant as a bar to a cause of action at law was triable in equity. "We do not attempt to say whether the release will collapse upon the showing of an illegal combination or will retain an independent life . . . . Enough for present purposes that there are issues triable at law, and none triable in equity. We leave our ruling there." *Id.* at 463, 56 S.Ct. at 299. The limited procedural issue decided in *Raytheon* has little relevance today, separate courts of law and equity having been abolished.

Carter v. 20th Century Fox Film Corp., 127 F.Supp. 675 (W.D.Mo.1955), falls closer to plaintiffs' mark. Plaintiff in *Carter* had leased two movie theatres to Fox in Sedalia, Missouri. The leases were allowed to expire when plaintiff refused to renew them at a lower rental rate. Plaintiff then tried to operate the theatres on her own, but Fox would not give her any first-run films. As a result, plaintiff was forced to close her theatres and to sign an option to lease them to Fox at substantially reduced rental rates. Also, in the contract was an option to buy the theatres and a release by plaintiff of all claims against Fox. Plaintiff complained of economic coercion and duress in entering into the contract. The judge assumed that, although not alleged in the complaint, an object of the alleged combination and monopoly was to compel plaintiff to execute the contract.

In denying defendant's motion for dismissal, the *Carter* judge noted the release was an integral part of the contract. Plaintiff's theory was that the contract itself was the culmination of a conspiracy to remove her from competition in the motion picture business in Sedalia. The judge felt that if the object of a conspiracy or monopolistic scheme were illegal, each part of the scheme would also be illegal. The release provision of the contract was part of the plan to obtain a monopoly, since the release was an integral part of that contract. The judge ruled that plaintiff should have an opportunity to show whether the contract was part of the plan and denied the defendant's motion. *Id.* at 679–681.

One aspect of the *Carter* decision distinguishes it from our case. In *Carter*, the release at issue was one clause of the option contract, which contract was the very restraint of trade complained of by Mrs. Carter. From the facts we have before us here, plaintiffs have made no attempt to show the part and parcel relationship which the release agreement had with the alleged combination in restraint of trade, or how the release itself furthered the alleged monopolization. A similar distinguishing characteristic prompted Judge Hill, in S. E. Rondon Co. v. Atlantic Richfield Co., 288 F. Supp. 879, 882 (C.D.Cal.1968), to rule for the defendant on its summary judgment motion based upon a similar release. The Third Circuit, in Taxin v. Food Fair Stores, Inc., 287 F.2d 448, 451 (3rd Cir. 1961), held it to be "at

least incumbent upon plaintiffs, in opposing a summary judgment [based upon a release], to state any special or unusual relation which the release may have borne to the general conspiracy." An unsupported allegation that the release is part of or in furtherance of the conspiracy does not "suffice to prevent the granting of summary judgment."[1]

I conclude a part and parcel argument may be used by a plaintiff to avoid a release in an antitrust action where it is shown that the release was an object of the combination or conspiracy or where it was an integral part of the scheme in restraint of trade. I find that those circumstances do not exist in the present case. There are no material factual issues with respect to the circumstances and events leading up to the release agreement between Dobbins and KMC. It does not appear that the release bore any integral relationship to the antitrust conduct complained of. Plaintiffs present no theoretical set of facts upon which a trier of fact could find a nexus between the release and the broader combination or contract prohibited by the Sherman Act.

As a second line of defense, plaintiffs attempt to analogize releases to consignments. Their reasoning is that: (1) like releases, consignments are also recognized as lawful contracts; and (2) but when a consignment becomes a device to avoid antitrust responsibility for eliminating price competition among retail dealers, or when a release becomes a device to further unlawful territorial restrictions, each loses its otherwise lawful nature and violates the Sherman Act. This analogy is excellent but suffers from the same infirmity as does the release itself: plaintiff must still establish

a tie-in between the consignment and the prohibited conduct. Plaintiffs have failed to establish any such tie-in.

Therefore, defendant KMC is entitled to a judgment as a matter of law on the validity of the release agreement of September 18, 1969. Having so ruled, there is no need to consider KMC's alternative motion for judgment on the February 27, 1967, release.

### B. Attempt and Conspiracy to Monopolize.

Plaintiffs' theory is that KMC has attempted to monopolize the distribution of Kawasaki motorcycles in the Northwest by successively limiting the Dobbins' distributorship to an ever-decreasing territory, with the eventual goal of eliminating Dobbins as a competitor to a KMC direct distribution system. The actions taken against Dobbins are alleged to be part of a scheme to monopolize the distribution of Kawasaki motorcycles throughout the United States. KMC has allegedly pursued this goal by means of territorial restrictions, reductions of territories of private distributors, discrimination in the supplying of motorcycles, and refusals to deal. Plaintiffs also contend that KMC, KHI, and others have conspired to accomplish the goal of monopolization.

At the heart of the issue is Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), later followed in Industrial Bldg. Materials, Inc. v. Interchemical Corp., supra, 437 F.2d at 1344. Plaintiff relies heavily on Judge Browning's broad language in Lessig that "[w]hen the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is 'not in issue.'"[2] 327 F.2d at 474. Tidewater had argued

---

1. The Ninth Circuit also rejected an attempt to avoid a release but was less than lucid in its opinion in Suckow Borax Mines Consol. v. Borax Consol., 185 F.2d 196 (9th Cir. 1950). The appellants there contended that the releases, or procurement of them by appellees, were "overt acts" in furtherance of the conspiracy in restraint of trade. The court agreed with the trial judge, however, that

the appellants had received consideration for the release or an adjudication of their rights. It did not evaluate on the merits the part and parcel argument tentatively advanced by the appellants.

2. Dictum in United States v. E. I. DuPont & Co., 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), was cited to support this position.

that attempt to monopolize is established only if there is proof of "dangerous probability of success," relying on Justice Holmes' opinion in Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Judge Browning rejected the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize. He held that the "specific intent itself is the only evidence of dangerous probability the statute requires . . . ." 327 F.2d at 474.

However, there is reason to doubt the efficacy of that broad holding. E. g., Agrashell, Inc. v. Hammons Products Co., 479 F.2d 269 (8th Cir. 1973). The Ninth Circuit has itself distinguished Lessig. In Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825, 832 (9th Cir. 1971), the court cited Swift & Co. v. United States, supra, in holding that two elements of proof were required to establish a violation of Section 2 of the Sherman Act with respect to an attempt to monopolize: (1) specific intent; and (2) sufficient market power to come dangerously close to success. Judge Hufstedler declined to reach the second element because she found the evidence and offer of proof produced on the first element insufficient. Nevertheless, the Cornwell dicta appears to be inconsistent with the Lessig holding that only specific intent is required.

Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972), recently dealt with this very issue and is factually similar to the present case. Stenocord had terminated Plaintiff's distributorship contract and began selling through its own outlet exclusively. Plaintiff sued on antitrust grounds and appealed an adverse summary judgment ruling. One of the plaintiff's claims was that Stenocord had violated Section 2 of the Sherman Act both by acquiring a monopoly and by attempting to monopolize. He argued that the exclusive control Stenocord exercised over the sales and servicing of its product constituted a monopoly. Judge Koelsch rejected the argument and answered that a manufacturer has a natural monopoly over his own products. Unless the manufacturer uses that monopoly "to gain control of the relevant market in which his products compete, the antitrust laws are not violated." 460 F.2d at 120; Industrial Bldg. Materials, Inc. v. Interchemical Corp., supra, 437 F.2d at 1344; see United States v. E. I. DuPont & Co., 351 U.S. 377, 392–393, 76 S.Ct. 994, 100 L. Ed. 1264 (1956).

With respect to his claim of attempted monopolization, Bushie contended that Lessig and Industrial Bldg. Materials, supra, supported his position that intent was the sole essential element and that no proof of Stenocord's power to monopolize the market was required. The court, however, distinguished both cases, finding that the attempted monopolization claims were founded upon "a substantial claim of restraint of trade, from which we indicated the specific intent required for a claim of attempt to monopolize could be inferred." 460 F.2d at 121. Bushie had failed to lay such a foundation.

Finally, the court disproved Bushie's argument that Stenocord products comprise the relevant market, and that the acquisition of exclusive control over them in the Phoenix area was in furtherance of an attempt to monopolize within the meaning of Section 2. Although a single manufacturer's products might comprise, by themselves, a relevant market for the purposes of a monopolization claim, "if they are so unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed." 460 F.2d at 121. The court found that Stenocord was not in such a position. Since none of Bushie's proof would have established a dangerous probability of monopolization in a properly defined market, the summary judgment was affirmed.

■■ It is difficult to obtain a clear picture of the Ninth Circuit's position

on the elements needed to establish a claim of attempted monopolization under Section 2. Nevertheless, both *Bushie* and *Cornwell Quality Tools Co., supra,* agree that both specific intent to monopolize and a dangerous probability of success in the relevant market are required. Defendant KMC argues that dangerous probability must be shown through evidence of sufficient market power. Certainly market power is one test of dangerous probability. However, *Lessig* and *Industrial Bldg. Products, Inc., supra,* suggest that another method of showing a dangerous probability is through a substantial claim of restraint of trade from which a strong specific intent can be inferred. Therefore, where a plaintiff has not established a substantial claim of restraint of trade, he must prove dangerous probability of success through sufficient market power. On the other hand, when a plaintiff can establish a substantial claim of restraint of trade, that evidence itself demonstrates a specific intent to monopolize so overwhelmingly so as to itself be proof of a dangerous probability of success. This conclusion is supported by Moore v. Jas. H. Matthews & Co., *supra,* 473 F.2d at 332. Judge Hufstedler found that proof of monopoly power is not required where a dangerous probability of success is shown. Evidence of market power is still relevant, but not indispensable, where a substantial claim of restraint of trade is made.

■ Applying these principles to the case before me, it appears that plaintiffs have established a substantial claim of restraint of trade under Section 1 of the Sherman Act.[3] A showing of a substantial restraint of trade under Section 1 may also tend to establish an attempt to monopolize under Section 2. Bushie v. Stenocord Corp., 460 F.2d at 120–121; Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d at 1344. Although the violation of Section 1 is forceful evidence of specific intent to

monopolize, I am unwilling, at this stage, to hold that such a violation alone constitutes a dangerous probability of success. Questions of the relevant market, for instance, remain unresolved. In their complaint plaintiffs appear to contend that the relevant market is only Kawasaki motorcycles, but in their memorandum they discuss the entire motorcycle market as the relevant market. The geographical market has not been properly defined; plaintiffs have used, at various times, the Pacific Northwest, the United States alone, and the United States and Canada. Defendant KMC has raised issues of antitrust conduct on plaintiffs' part which would be relevant to both KMC's intent to monopolize and the dangerous probability of success.

Therefore, I will deny KMC's motion for summary judgment as to the claims of attempt and conspiracy to monopolize.

## C. The Claims of Discrimination.

■ Plaintiffs contend that KMC has violated Section 2 of the Clayton Act, 15 U.S.C. § 13, by discriminating against plaintiffs in the supplying of Kawasaki motorcycles. The foundation of their assertion is that KMC discriminated by giving favored treatment to other distributors in the supply of new models. Plaintiffs cite nationwide statistics to support that claim.

Although the Section 2 of the Clayton Act deals primarily with price discrimination, plaintiffs attempt to bring themselves within the purview of the Act by claiming that the supplying of motorcycles is a service within the meaning of Section 2(e). No case is cited in support of this novel theory; it appears to be one of first impression in this or any court. Nevertheless, it is conceivable that discrimination in the supplying of a product to a distributor could have a similar effect to price or services discrimination. Such a scheme, if proven, could result in a lessening of competition.

3. See discussion of plaintiffs' partial summary judgment motion. § II A, *infra.*

Although I am not convinced that the Clayton Act was meant to reach this situation, I will deny the motion for summary judgment in order to discover the facts upon which plaintiffs base their imaginative supposition.

## II

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for a determination in their favor that:

1) The exclusive territory provision (¶ 4) of the September, 1969, distributorship agreement constitutes a violation of Section 1 of the Sherman Act;

2) KMC is liable to plaintiffs for:[4]

a) the territorial restriction in the 1967 distributorship agreement;

b) KMC's 1967 withdrawal of southern Idaho and 1969 withdrawal of the rest of Idaho, Alaska, Washington, and all of Oregon but Multnomah County from Dobbins' territory; and

c) the 1972 refusal to renew Dobbins Imports, Inc. as a Kawasaki distributor;

3) KMC's *in pari delicto* defense is not a defense to claims alleging Sherman Act Section 1 violations;

4) KMC's counterclaim is insufficient as a matter of law.

#### A. *The Exclusive Territory Provision.*

■ Paragraph 4 of the 1969 distributorship agreement between KMC and Dobbins provides:

EXCLUSIVE TERRITORY OF DOBBINS for the distribution of Ka-

wasaki brand motorcycles shall be the County of Multnomah in the State of Oregon, in which territory Dobbins agrees to actively franchise dealers and promote the sale of Kawasaki motorcycles to the best of their [sic] ability. Dobbins agrees not to sell wholesale outside this territory, and such sales will constitute a breach of this agreement.

The territorial restriction contained in this agreement is a *per se* violation of Section 1 of the Sherman Act, since KMC was selling motorcycles to Dobbins for resale.[5] United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967). Defendant KMC concedes that the restriction is a "technical" violation, but argues that Dobbins insisted on that particular provision. That argument may be relevant as a mitigating defense at trial,[6] but the restriction remains a violation. I find that the exclusive territorial restriction contained in the 1969 distributorship agreement is a *per se* violation of Section 1 of the Sherman Act. The first part of plaintiffs' motion for summary judgment is granted.

#### B. *The 1967 Territorial Restriction, 1967 and 1969 Withdrawals of Territory, and the 1972 Refusal to Renew.*

By the language of the release of September 18, 1969, the 1967 and 1969 claims were to be settled by Dobbins' acceptance of the $43,000 check. I have already found that release valid and have no need to consider any claims arising before September 18, 1969. The

4. The second part of the original motion filed by plaintiffs was different than the part set out here. In the original motion filed January 15, 1973, plaintiffs asked for summary judgment declaring the combination and contracts maintained by KMC through the use of exclusive territorial agreements with its private distributors between 1964 and 1970 to be in violation of Section 1 of the Sherman Act. When plaintiffs filed their supporting memorandum on January 23, 1973, the second part of the original mo-

tion had been eliminated and the present second part, which is set out above in the opinion, had been substituted. I have considered the motion as it is propounded in the memorandum of January 23. KMC has had adequate notice of the change, and in fact discussed the new second part in its memorandum of March 16, 1973, and argued against it orally.

5. See ¶ 7 of the 1969 Agreement.

6. See discussion of *in pari delicto* doctrine, § II C, *infra.*

1972 termination of the Dobbins distributorship is really the culmination of the alleged scheme to eliminate Dobbins as a competitor. Accordingly, it is vitally important that all of the evidence on this question come in at the trial on the merits. I will deny the second part of the plaintiffs' summary judgment motion in its entirety.

## C. *The In Pari Delicto Defense.*

KMC contends in its Answer and Counterclaim that because plaintiffs actively sought the inclusion of the territorial restriction in the 1969 agreement and engaged in other antitrust conduct, they are barred from recovery on their claims by the common law doctrine of *in pari delicto*. Plaintiffs claim that they are entitled to summary judgment dismissing this defense on the ground that the defense cannot be asserted in antitrust actions, and that, in any event, there are no facts which would support such a defense.

The resolution of this issue ultimately derives from the interpretation of Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982 (1968). *Perma Life* was a private treble damage action brought by several parts dealers who had entered into dealership contracts with defendants, who manufactured mufflers and exhaust system parts. Plaintiffs alleged, among other things, that certain provisions of their dealership contracts constituted a restraint of trade in violation of the Sherman and Clayton Acts. The trial court granted summary judgment for defendants on the ground that the plaintiffs' claims were barred by the doctrine of *in pari delicto*. The substance of the defense was that all of the plaintiff dealers had sought out Midas Muffler dealerships with full knowledge of the contract provisions and had subscribed to the agreements. All had made enormous profits as dealers and had voluntarily entered into new franchise arrangements while fully aware of the challenged restrictions. The Seventh Circuit agreed with the judgment of the District Court.

The Supreme Court found itself in "complete disagreement" with the Seventh Circuit. Justice Black found nothing in the language of the antitrust acts which indicated "that Congress wanted to make the common-law *in pari delicto* doctrine a defense to treble-damage actions, and the facts of this case suggest no basis for applying such a doctrine even if it did exist." 392 U.S. at 138, 88 S.Ct. at 1984. The court recognized that "[t]he plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition . . . . And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct. [Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)]." *Id.* at 139, 88 S.Ct. at 1984.

The court found these plaintiffs less than totally reprehensible since they had apparently made continuing objections to some provisions of the agreements. They had accepted the restraints simply because it was necessary in order to obtain an otherwise attractive business opportunity. The court finally held in broad language "that the doctrine of *in pari delicto*, with its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action." *Id.* at 140, 88 S.Ct. at 1985.

The *Perma Life* decision may not be quite as expansive as the language purports to be. Justice Black qualified his holding by suggesting that a plaintiff who aggressively supported and furthered the monopolistic scheme as a part and parcel of it might be barred from recovery. However, he declined to reach the questions of "whether such truly complete involvement and participation . . . could ever be a basis, *wholly*

*apart from the idea of in pari delicto,* for barring a plaintiff's cause of action . . . ." *Id.* [Emphasis supplied.] What the opinion implies is that the common law doctrine of *in pari delicto* is inappropriate to antitrust actions. If a defense of the plaintiff's participation and involvement is to be raised in a private antitrust suit, then it must be a defense fashioned by the nature of the statutory causes of action themselves, rather than a defense lifted from a pre-existing doctrine.

This view of the majority opinion is bolstered by several of the four separate opinions. Justice White, concurring, conceded that no simple formula could test all possible factual situations, but outlined some evidence which would be relevant proof: facts as to the relative responsibility for originating, negotiating, and implementing the scheme; evidence as to who might reasonably have been expected to gain from the provision or conduct making the scheme illegal under Section 1; proof of whether one party attempted to terminate the arrangement and encountered resistance or countermeasures from the other; facts showing who ultimately profited or suffered from the agreement. *Id.* at 146–147, 88 S.Ct. 1981. Justice Fortas believed that a limited version of *in pari delicto* should be retained to reach situations where the "partners" had relatively equal economic positions. Under such facts, *in pari delicto* would bar recovery under the antitrust laws. *Id.* at 147–148, 88 S.Ct. 1981.

Justice Marshall, concurring in the result, found the basic principle behind the *in pari delicto* doctrine—that a wrongdoer should not be permitted to profit from his own wrongdoing—to be treated too lightly by the majority. He would have held for a limited application of that basic principle in the antitrust field. "[W]here a defendant in a private antitrust suit can show that the plaintiff actively participated in the formation and implementation of an illegal scheme, and is substantially equally at fault, the plaintiff should be barred from imposing liability on the defend-

ant." He saw the reasons for rejecting the approach of the Circuit Court less related to the public interest in eliminating all forms of anticompetitive business conduct, as Justice Black reasoned, and more related to the equities between the parties, as Justices White and Fortas suggested. *Id.* at 148–153, 88 S.Ct. 1981.

Courts since *Perma Life* have interpreted its effect with varying results. The trial judge in Morton v. National Dairy Products Corp., 287 F.Supp. 753, 765 (E.D.Pa.1968), aff'd, 414 F.2d 403 (3rd Cir. 1969), cert. denied 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970), rejected the *in pari delicto* defense advanced by the defendant on the ground that it had been "completely negatived" by *Perma Life*. In Schokbeton Products Corp. v. Exposiac Industries, Inc., 308 F.Supp. 1366, 1369 (N.D.Ga. 1970), plaintiff sued for breach of contract and the defendant counterclaimed, alleging a violation of antitrust law. On plaintiff's motion to dismiss the counterclaim, the District Court judge ruled that the *in pari delicto* defense was not available to the plaintiff on the counterclaim, citing *Perma Life*.

Two circuit courts which have confronted this issue reached the conclusion that the *Perma Life* decision is more limited than it appears at first glance. In Premier Electrical Constr. Co. v. Miller-Davis Co., 422 F.2d 1132, 1138 (7th Cir. 1970), Judge Swygert found *Perma Life* to hold "only that plaintiffs who do not bear equal responsibility for creating and establishing an illegal scheme, or who are required by economic pressures to accept such an agreement, should not be barred from recovery simply because they are participants." Like Justice White, the court outlined several factors relevant in determining whether participation by the plaintiff in an illegal scheme constitutes a defense to a treble damage action. Such factors present difficult factual issues, which are not appropriate for a summary judgment motion.

The court in Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 15 (4th Cir. 1971), decided that the defendant's

counterclaim was based upon the type of situation which the Supreme Court excluded from the scope of its opinion in *Perma Life*. The Circuit Court found the teaching of the five opinions to be that "when parties of substantially equal economic strength mutually participate in the formation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other."

■ Having concluded that the defense of plaintiffs' complete participation and involvement in the alleged monopolistic scheme, which defendant KMC has raised, exists, although not as the doctrine of *in pari delicto*, I must decline to rule for plaintiffs on their motion. In their memorandum plaintiffs have also contended that there are no facts which would support such a defense even if it did exist. I am incapable of making that determination at this stage. The parties must await the trial to present facts relevant to the defense.

D. *KMC's Counterclaim.*

This part of the plaintiffs' motion is governed by much the same considerations as those discussed in the previous section. There are complex factual questions involved which must be determined by the trier of fact.

### III

### KHI'S MOTION TO DISMISS

■ I find, after having examined the record and materials submitted by the parties, that this Court has jurisdiction over the person of the defendant, Kawasaki Heavy Industries, and that venue is properly laid in the District of Oregon. From the facts adduced, it appears that KHI has ignored the formal corporate division between it and its subsidiary, Kawasaki Motors Corporation, U.S.A., and has been involved directly in KMC's operations and policy decisions. By these actions, KHI has submitted itself to this Court's jurisdiction. I will not attempt to recite individual facts leading to this decision since they are well set out in the memoranda. Moreover, as counsel for KHI points out, it is the totality of the conduct which must be the basis for the decision, not isolated acts. United States v. Scophony, 333 U.S. 795, 817, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

Moreover, since KHI has exerted an inordinate amount of control over its subsidiary, KMC, then it must also be held to have transacted business in this district through that subsidiary. Therefore, jurisdiction is proper in this case under 15 U.S.C. §§ 15 and 22, and venue is proper in the District of Oregon.

Although my rulings on the various parts of each motion are incorporated in the text of the opinion, I feel it to be convenient to set out a composite scorecard here.

On KMC's motion for partial summary judgment, it is:

1) Granted as to the validity of the September 18, 1969, release;

2) No ruling is necessary on the 1967 release;

3) Denied as to plaintiffs' claims of attempt and conspiracy to monopolize;

4) Denied as to plaintiffs' claims of discrimination.

On plaintiffs' motion for partial summary judgment, it is:

, 1) Granted with respect to their claim that the territorial restriction is a violation of Section 1 of the Sherman Act;

2) Denied as to the 1967 territorial restriction, the 1967 and 1969 withdrawals, and the 1972 refusal to renew the Dobbins distributorship;

3) Denied as to the existence of KMC's *in pari delicto* defense; and

4) Denied as to the allowance of KMC's counterclaim.

On defendant KHI's motion to dismiss, it is denied.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).