**HALLMARK INDUSTRY, Appellant,**

**v.**

**REYNOLDS METALS COMPANY et al., Appellees.**

**HALLMARK INDUSTRY, Appellant,**

**v.**

**HARVEY ALUMINUM (INCORPORATED), Appellee.**

**Nos. 71–1492, 26729.**

United States Court of Appeals, Ninth Circuit.

Dec. 5, 1973.

Rehearing Denied Jan. 18, 1974.

Joseph L. Alioto, Peter J. Donnici, Joseph M. Alioto (argued), Lawrence J. Appel, San Francisco, Cal., for appellant.

McCutchen, Doyle, Brown & Enersen, John N. Hauser (argued), James L. Hunt, San Francisco, Cal., for appellee, Reynolds Metals Co.

Gibson, Dunn & Crutcher, John J. Hanson, Don J. Belcher (argued), Los Angeles, Cal., for appellee, Harvey Aluminum, Inc.

Latham & Watkins, Max L. Gillam (argued), Michael J. Shockro, Los Angeles, Cal.; McDermott, Will & Emery, Samuel Weisbard, Chicago, Ill., for appellee, Stanray Pacific Corp.

Before HAMLIN and CHOY, Circuit Judges, and SKOPIL,* District Judge.

SKOPIL, District Judge:

This is an antitrust suit for treble damages brought under Section 4 of the Clayton Act. 15 U.S.C. § 15. Appellant Hallmark Industry charged appellees Reynolds Metals Co., Stanray Pacific Co., and Harvey Aluminum, Inc. with violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2. Essentially, Hallmark's claim is that, after Hallmark bid successfully on a United States Army contract to supply prefabricated aluminum buildings for use in Vietnam, Stanray, Reynolds, and Harvey conspired to thwart Hallmark's efforts to obtain the necessary aluminum to perform the contract. Appellant also claims that Stanray attempted to monopolize the relevant market.

* Honorable Otto R. Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

The case was tried by a jury. At the close of the evidence, defendants moved for a directed verdict on all issues. The trial judge directed a verdict for Stanray on the issue of its Section 2 attempt to monopolize; the remaining issues were given to the jury. The jury returned a verdict against Reynolds and Stanray for $211,800, which, when trebled, could result in a final judgment of $635,400. The jury found that Harvey was not a party to the conspiracy. Reynolds and Stanray then filed motions for judgment notwithstanding the verdict or, in the alternative, for a new trial. Fed.R.Civ.P. 50(b) and 59. The trial court granted the motion for a judgment n. o. v. and, if that ruling were reversed on appeal, a new trial. Hallmark appeals from that ruling in No. 71–1492, and from the jury's verdict for Harvey in No. 26729. The cases were consolidated for hearing only. We affirm both.

Appellant again raises the issue of the District Court's lack of jurisdiction to entertain appellees' motions for judgment n. o. v. or for a new trial. The question was raised in this court previously and was denied. Hallmark Industry v. Peckham, No. 26915 (9th Cir., Feb. 11, 1971). We do not disturb that decision.

# I

## THE FACTS

Appellant Hallmark manufactures and sells prefabricated metal buildings. Appellee Stanray manufactures and sells a diverse line of fabricated metal products, including buildings. Appellees Harvey and Reynolds compete in manufacturing, distributing, and selling of aluminum products.

In January, 1966, Reynolds and Stanray met, apparently hoping to promote an aluminum hut project for governmental use. It is not clear that an actual agreement was reached, as appellant urges. In March, 1966, the Army requested bids on a contract for 3,000 aluminum huts for use in Vietnam. The contract specifications were general. Each bidder was to provide his own concept of an appropriate design, price, and delivery date.

In April, 1966, 26 companies submitted bids on the government contract, including Hallmark, Reynolds, and Stanray. Hallmark's bid, prepared for this contract, was the lowest. Stanray's bid, based on a design it had sold earlier to the Atomic Energy Commission, was the second lowest. Reynolds' bid proposed a design which was not acceptable to the Army. In May, 1966, Reynolds was notified its proposal was no longer under consideration.[1]

Stanray was annoyed by Reynolds' submission of a bid. Hallmark contends that this annoyance demonstrates that Stanray and Reynolds had agreed, in January, to conspire to insure that Stanray received the Army contract, and that the Reynolds' bid was counter to the agreement. At the same time, Hallmark contends that the bid was part of a conspiracy to rig the bids and inflate the price paid by the government.

In addition to submitting a bid, Reynolds also began making contacts with potential awardees of the contract, hoping to supply the successful bidder with its aluminum requirements. In April, 1966, Reynolds' representatives met with Hallmark personnel to determine whether Reynolds could supply Hallmark, if Hallmark received the contract.

On May 9, 1966, Reynolds offered its services to Stanray, again hoping to supply Stanray with aluminum if it obtained the contract. Reynolds' engineers made a trip to Stanray's Los Angeles plant to see if Reynolds could supply Stanray's requirements. They determined that they could not. After leav-

---

1. Appellants make much of the fact that the cost of the original bid prepared by Reynolds' engineer was raised substantially. However, the evidence was that one item, representing 12% of the entire bid, slated for a 100% increase, was reduced to a 50% increase. Even without this increase, it is unlikely that the Reynolds' bid would have been more competitive.

ing Stanray's plant, the Reynolds' engineers traveled to the Hallmark plant in Patterson, California. The Reynolds' representatives examined Hallmark's design and told Hallmark they could supply their aluminum needs for $1,900,000. Stanray heard about Reynolds' efforts to aid Hallmark and contacted Reynolds to learn the nature of those efforts.

After inspecting Hallmark's plant to determine its capability of fulfilling the contract, the government entered into final negotiations with Hallmark. Hallmark began making arrangements with suppliers to meet its raw materials requirements. Hallmark asked all suppliers to agree to a bank escrow, from which the suppliers would be paid as the government paid for the buildings. Reynolds, however, insisted on a letter of credit for the full amount of the aluminum it was to supply. On May 13, 1966, Reynolds informed the Army of its intention to demand the full letter of credit. Hallmark attempted to find an alternate source of supply for aluminum. On May 23, 1966, Hallmark notified Reynolds that it did not intend to buy from Reynolds.

Hallmark contends that the $1.9 million letter of credit was the result of the Stanray-Reynolds conspiracy and was really a subterfuge for refusing to supply Hallmark. Reynolds, on the other hand, says that it decided that full security was necessary to insure payment by Hallmark. Hallmark had substantial debts, lacked working capital, had never made a profit, and had no unencumbered assets. Reynolds was unwilling to risk not getting paid and, therefore, demanded the letter of credit.

Meanwhile, Stanray was trying to remain in contention for the Army contract by working with the George C. Widman Co., another aluminum supplier, to reduce the price of its design to make it more attractive to the Army. Nevertheless, the Army decided to purchase from Hallmark.

Having failed to obtain their aluminum requirements from Reynolds on Hallmark's terms, appellant approached appellee Harvey. Harvey agreed to supply the aluminum for about $2,000,000, but it also requested a letter of credit for the full amount of the purchase. Appellant contends this demand was the result of a Reynolds-Stanray-Harvey conspiracy to secure the Army contract for Stanray. Hallmark finally obtained its aluminum needs from Ador-Hilite, but for substantially more than the Reynolds or Harvey quotations. Ador-Hilite also furnished Hallmark with the necessary financing.

The final contract between Hallmark and the Army required complete and accurate disclosure of the estimated costs for the performance of the work. 10 U. S.C. § 2306(f); 32 C.F.R. § 3.807–3. On May 27, 1966, Hallmark's president signed and sent to the government Form DD 663 containing the cost disclosures. The contract was signed on June 6, 1966, for the total amount appearing on Form DD 663. The permissible net profit of 11% was allowed on that amount.[2]

## II

## THE DIRECTED VERDICT FOR STANRAY

We turn first to appellant's contention that the trial court erred in directing a verdict for Stanray on the issue of its alleged attempt to monopolize in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. At the heart of the issue here is Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), later followed in Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1344 (9th Cir. 1970), and Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9th Cir. 1973). Appellant relies on *Lessig's* holding that "when the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is 'not in issue.'" 327 F.

2. Hallmark's final net profit actually exceeded 11%.

2d at 474. In *Lessig*, Tidewater had argued that attempt to monopolize is established only if there is proof of "dangerous probability of success", relying on Justice Holmes' opinion in Swift & Co. v. United States, 196 U.S. 375, 25 S. Ct. 276, 49 L.Ed. 518 (1905). Tidewater's contention was that such proof required an evaluation of its power in the relevant market. *Lessig* rejected the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize. The court held that the "specific intent itself is the only evidence of dangerous probability the statute requires . . . ." 327 F.2d at 474.

This court has dealt with Section 2 attempt to monopolize claims several times since *Lessig*.

In Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825, 832 (9th Cir.1971), Cornwell had terminated C.T.S.'s sole distributorship for California and Nevada and had opened its own distributorship. Vigorous competition ensued between Cornwell and C.T.S., which was then distributing the products of a competitor of Cornwell. Cornwell and C.T.S. each alleged restraints of trade by the other. On the issue of attempt to monopolize by Cornwell, this court held that the evidence and offer of proof on specific intent to monopolize was insufficient.[3]

In Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972), Stenocord had terminated Bushie's distributorship contract and had begun selling through its own outlet exclusively. With respect to his claim of attempt to monopolize, Bushie contended that *Lessig* and *Industrial Building Materials, supra*, supported his position that intent was the sole essential element and that no proof of Stenocord's power to monopolize the market was required. We distinguished both cases, finding that the attempted monopolization claims there were founded upon "a substantial claim of restraint of trade, from which we indicated the specific intent required for a claim of attempt to monopolize could be inferred". 460 F.2d at 121. Bushie had failed to lay such a foundation.

Finally, in Moore v. Jas. H. Matthews & Co., 473 F.2d 328, *supra*, a cemetery monument dealer sued several cemeteries and a grave marker manufacturer, charging monopolization, attempts to monopolize, and restraints of trade. This court reversed summary judgment for the defendants. With regard to the claim of attempt to monopolize, the court reiterated the *Lessig* rule that proof of monopoly power is not required. 473 F.2d at 332.

Nonetheless, appellees in this case argue that dangerous probability must be shown through evidence of sufficient market power. Certainly market power may establish dangerous probability. However, *Lessig, Industrial Building Materials*, and *Moore, supra*, hold that dangerous probability may also be shown through proof of specific intent to set prices or exclude competition in a portion of the market without legitimate business purpose. This specific intent must be accompanied by predatory conduct directed to accomplishing the unlawful purpose. Ordinarily specific intent is difficult to prove and will be inferred from such anticompetitive conduct. Therefore, evidence of market power may be relevant, but it is not in-

---

3. The *Cornwell* opinion states that to establish attempt to monopolize, C.T.S. had to prove "specific intent to monopolize, *and* . . . sufficient market power to come dangerously close to success". 446 F.2d at 832 (emphasis added). This statement was offered as a restatement of the holding in Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). As we pointed out in *Lessig*, however, *Swift* spoke of "intent and the *consequent* dangerous probability". 327 F.2d at 474 n. 46 (emphasis added in *Lessig*). The *Cornwell* dictum cannot be read to require proof of any particular degree of market power as an independent and necessary element of attempt to monopolize, for such a requirement would be contrary to the holding in *Lessig*, more recently reaffirmed in *Industrial Building Materials, supra*, and *Moore, supra*.

dispensable where a substantial claim of restraint of trade is made.

■ Hallmark has failed to produce sufficient evidence that Stanray had the specific intent to monopolize the market for aluminum huts in Vietnam. The only inference one could draw from the evidence before the court was that Stanray had the intent to obtain this particular contract from the Army. Therefore we find the directed verdict in favor of Stanray as to its unilateral attempt to monopolize to be correct as a matter of law.

## III

### THE JUDGMENT NOTWITHSTANDING THE VERDICT

In his opinion granting the Reynolds and Stanray motions for a judgment notwithstanding the verdict, Judge Peckham based his ruling on three grounds: First, there was no substantial evidence upon which a jury could find a conspiracy between Reynolds and Stanray. Second, assuming *arguendo* that the evidence supported the jury's finding that a Reynolds-Stanray conspiracy did exist, Section 1 of the Sherman Act was not violated as a matter of law. Third, there was no *prima facie* evidence that the acts of the appellees caused damage to the appellant.

A. *Was the evidence sufficient to sustain the jury's verdict?*

■ The standard by which a judgment notwithstanding the verdict is measured is precisely the same as that for a directed verdict. Juhnke v. EIG Corp., 444 F.2d 1323, 1325 (9th Cir. 1971); 9 Wright & Miller, Federal Practice and Procedure § 2537 (1971). The plaintiff still has the burden of establishing a *prima facie* case although

he is entitled to the benefit of all favorable inferences which can be drawn from the evidence. Independent Iron Works v. United States Steel Corp., 177 F.Supp. 743, 746 (N.D.Cal.1959), aff'd, 322 F.2d 656 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); Juhnke v. EIG Corp., *supra*, 444 F.2d at 1325.

■ The crucial issue here is whether the Reynolds' demand for a $1.9 million letter of credit resulted from a conspiratorial agreement between Reynolds and Stanray. We agree with Judge Peckham that there were four essential facts before the jury: (1) Reynolds actively aided Hallmark in the preparation of its bid for an Army contract; (2) Reynolds also worked with Stanray on its development of a contract bid; (3) Stanray became aware of Reynolds' efforts to aid Hallmark and contacted Reynolds to ascertain the nature and extent of those efforts; (4) Reynolds demanded a letter of credit from Hallmark for the full amount of the proposed aluminum supply contract.[4] If the evidence showed: (1) that the Reynolds credit demand was unreasonable and (2) that Reynolds would benefit by refusing Hallmark's aluminum order, then this, together with the facts outlined above, would provide a sufficient basis for a jury to infer that a Reynolds-Stanray conspiracy existed.

With respect to the credit demand, certainly Hallmark's financial position of near insolvency provides a legitimate business motive for the credit requirement.[5] See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Moreover, Reynolds had nothing to gain by an unreasonable refusal to deal with Hallmark.

4. Although Hallmark lays stress on Stanray's reaction to Reynolds' bid for the contract, we do not consider that an essential fact. See the discussion of the importance of the Reynolds' bid in § 3, *infra*.

5. The persons responsible for the Reynolds credit decision testified that the decision was based upon independent considerations and that they had no contact with Stanray prior to the decision.

**14**

The credit demand actually resulted in the loss of a $1.9 million opportunity for Reynolds. There was no reason for Reynolds to favor Stanray over Hallmark since the Reynolds' engineers had already determined that they could not supply Stanray with its needs. Even if Reynolds could have supplied the aluminum for Stanray's design, there was no reason to expect that Reynolds' refusal to sell to Hallmark would result in Stanray's obtaining the contract. Several other companies could have supplied Hallmark with its aluminum requirements.

Given no contrary evidence, a jury question might be presented as to Reynolds' motives in demanding the letter of credit, wholly apart from the wisdom of that decision. However, there were other non-conspiratorial motives involving the exercise of business judgment as to the attractiveness of the opportunity offered by Hallmark. Therefore, in view of the overwhelming contrary evidence, only one conclusion can be drawn: That Reynolds' security requirements did not result from conspiratorial motives. First National Bank of Arizona v. Cities Services Co., 391 U.S. 253, 277, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Since we have decided the evidence was insufficient to sustain the jury's verdict, we need not reach the other two grounds upon which the trial judge based his opinion.

IV

HALLMARK INDUSTRY v. HARVEY ALUMINUM, INC.
No. 26729

We now turn to the appeal in No. 26729. Appellant here contends that the trial court committed reversible error in excluding at the trial the so-called "Shrank reports" and related deposition testimony.

The Shrank reports consist of forms entitled "Daily Sales Report" filled out by Donald Shrank, then Sales Engineer for Harvey, and submitted to Harvey's district sales manager for the Los Angeles area. Shrank purported to record the results of his calls upon prospective purchasers of aluminum. The particular reports in question deal primarily with conversations between Shrank and a representative of Stanray.

The trial court excluded the documents on the grounds that they were hearsay statements which were not admissible under any exception to the hearsay rule, that they could not be received for any non-hearsay purpose and that they contained undue opinions, conclusions, and impressions. Appellant contends that the excluded evidence was relevant and material, that it was admissible on several grounds, and that its exclusion was prejudicial to appellant's case.

■ We find it unnecessary to reach the issues raised by appellant's claim that the evidence was improperly excluded. If the evidence had been admitted at trial, the evidence against Harvey, taken as a whole, would not have been sufficient to support a verdict in favor of appellant. Therefore, if any error was committed by the trial judge, it was harmless because it could not have prejudiced the substantial rights of appellant. Fed.R.Civ.P. 61; Vecchio v. Anheuser-Busch, 328 F.2d 714, 719 (2nd Cir. 1964), cert. denied, 379 U.S. 831, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964); Jones v. Mutual Life Ins. Co. of New York, 113 F.2d 873, 874 (8th Cir. 1940). Accordingly, we affirm in No. 26729.