**CALIFORNIA STEEL AND TUBE,**
Plaintiff/Appellant,

v.

**KAISER STEEL CORPORATION,**
Defendant/Appellee.

No. 79–3333.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1981.

Decided April 15, 1981.

Harold R. Collins, Jr., Los Angeles, Cal., argued for plaintiff/appellant; Martin J. Trupiano, Blecher, Collins & Hoecker, Los Angeles, Cal., on brief.

Jesse B. Grove, III, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for defendant/appellee.

Before HUG, FERGUSON and REINHARDT, Circuit Judges.

HUG, Circuit Judge:

California Steel and Tube brought this antitrust action alleging that Kaiser Steel Corporation's acquisition and operation of a steel tubing division violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 & 18. The district court, 469 F.Supp. 265, granted summary judgment for Kaiser Steel Corporation, and California Steel and Tube appeals. Because there are numerous issues of fact which preclude the entry of a summary judgment, we reverse.

California Steel and Tube (CalSteel) is a manufacturer of mechanical steel tubing and other steel products. In January 1970, it shared the tubing market in the Western United States with five other producers. One, MSL Tubing (MSL), held a 40% share of the market; the remaining five each held 15% or less of the market. Kaiser Steel Corporation (Kaiser) produces and sells steel nationwide. In March 1970, it acquired the assets of MSL; it then entered the steel tubing market, operating the acquired company as Kaiser Steel Tubing.

Steel tubing is manufactured from sheet steel products. These include prime sheets, rolled and finished to the order of the customers who manufacture tubing, and secondary sheets, which result from defects in production or overproduction of prime sheets. Both types of sheets are used to manufacture mechanical and structural tubing. These tubing types are distinguished by their size and use.

Prior to Kaiser's acquisition of MSL, CalSteel had purchased prime sheets from Kaiser; it had not purchased secondary. MSL was a purchaser of secondary sheets, in part because its facility allowed it to purchase

and warehouse large quantities. Following the acquisition, Kaiser continued to transfer secondary sheets to its tubing division, as well as making sales to other tubing manufacturers. CalSteel did not become a purchaser of secondary.

CalSteel's purchases of prime sheets from Kaiser diminished after the acquisition. It made purchases of prime sheets from other domestic and foreign producers. During 1973–74 there was a world-wide steel shortage accompanied by domestic price controls. CalSteel was unable to acquire sufficient steel, and requested additional supplies of sheet, both prime and secondary, from Kaiser, but did not receive them.

CalSteel brought this action in 1975 to challenge the acquisition and certain alleged pricing and marketing practices in the period 1970–75. It claimed that Kaiser's dominant position in the sheet steel market in Southern California allowed it to raise sheet steel prices while holding tubing prices below cost, thus exerting a vertical price squeeze on its competitors in the tubing market. It further alleged that Kaiser refused to sell CalSteel either primary or secondary sheet steel in an effort to enhance Kaiser's position in the tubing market, and that the refusal caused CalSteel's inability to meet its customers' demands and a loss of profit. CalSteel also alleged Kaiser attempted to monopolize the tubing market.

■ In reviewing the decision of the district court, we note that summary judgment is to be used sparingly in complex antitrust litigation in which motive and intent play leading roles. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Beltz Travel Service, Inc. v. International Air Transport Association*, 620 F.2d 1360, 1364 (9th Cir. 1980).

## I

The district court examined the opinion testimony of CalSteel's expert, Dr. Paul Marshall, and found that it was insufficient to create factual disputes as to the issues on which it was offered. That evaluation was based on Dr. Marshall's qualifications. Dr. Marshall is a graduate of the Harvard School of Business Administration. He served as a consultant to the Council on Wage and Price Stability, chairing its Steel Price Symposium. He has testified on conditions in the steel market before the U. S. International Trade Commission and the U. S. House of Representatives. Dr. Marshall co-authored two studies: "Economics of International Steel Trade: Policy Implications for the United States", and "A Methodological Approach for Use in Assessing Impact of Government Regulation on the Steel Industry." He has authored a textbook on production and operations management.

■ Where an expert is not obviously unqualified, questions at the summary judgment stage as to the expert's qualifications should rarely be resolved by exclusion of the evidence. The fact that Dr. Marshall is an economist, rather than an accountant, does not make him obviously unqualified in light of his other credentials and experience. Consideration should therefore have been given to his opinions in evaluating the summary judgment motion. In considering such a motion, the trial judge may not evaluate the credibility of a witness or weigh the evidence. *Neely v. St. Paul Fire & Marine Insurance Co.*, 584 F.2d 341, 344 (9th Cir. 1978). The focus of the evaluation is to determine if a factual dispute exists.

■ The expert testimony in question was offered as to (1) the definition of the relevant geographic market in sheet steel, and (2) whether Kaiser's pricing practices in the tubing market were predatory. Both of these factual issues are elements of CalSteel's claim that Kaiser's acquisition of its tubing division violated Section 7 of the Clayton Act. Therefore, summary judgment for Kaiser as to that claim was granted in error.

## II

■ A unilateral refusal to deal may violate the Sherman Act if it is accompanied by anti-competitive acts or purpose.

Times-Picayune v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953). Such a refusal may constitute an unreasonable restraint of trade even if it is justified by legitimate business reasons. *Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1195 (9th Cir. 1980). Whether a defendant refused to deal, and whether the refusal was motivated by an anti-competitive intent, are factual issues that "should not be taken from the jury unless the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978). Because the evidence created a dispute as to Kaiser's motivation in refusing to sell prime and secondary sheets to CalSteel in the quantities it requested, summary judgment should not have been granted on the claim of refusal to deal. The district court erred in its finding that the refusal to sell secondary sheets was justified by CalSteel's buying history prior to Kaiser's acquisition of the tubing division. Activities which may have been lawful before the acquisition may have had an anti-competitive impact after it. *Purex Corp. v. Procter & Gamble Co.*, 596 F.2d 881, 885 (9th Cir. 1979).

### III

The elements required to establish a claim of attempt to monopolize in this circuit have been variously stated, but generally plaintiff must show: (1) specific intent to destroy competition, (2) predatory conduct directed to accomplishing that purpose, and (3) dangerous probability of success. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hallmark Industry v. Reynolds Metals Company*, 489 F.2d 8, 12–13 (9th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). These elements need not be established independently. Some circumstances permit an inference of intent and then, in turn, of probability. The focus in drawing these inferences is the character of the conduct.

Where the plaintiff presents only evidence of conduct, intent is to be inferred only if the conduct is clearly threatening to competition or exclusionary. Where the tactics are less aggressive, the inference of intent should be supported with evidence of market power. *Janich*, 570 F.2d at 854, n.4.

As the district court viewed the claim of attempted monopolization, CalSteel failed to establish either specific intent or dangerous probability of success. The court's findings compartmentalize these elements, depriving the plaintiff of any possible inferences. CalSteel offered evidence of two types of conduct on which a claim of attempt could be based: predatory pricing and refusal to deal. Genuine issues remain as to these alleged practices. The parties also dispute the geographic and product definitions of the steel tubing market, leaving the question of dangerous probability unresolved. Therefore, summary judgment as to the claim of attempted monopolization was also granted in error.

REVERSED and REMANDED.