**D & R DISTRIBUTING CO., INC., Plaintiff,**

v.

**CHAMBERS CORPORATION, Amana Refrigeration, Inc., R & K Distributors, Inc., Rangaire Corporation, Defendants.**

**No. CV F 80–297–EDP.**

United States District Court, E.D. California.

Sept. 6, 1984.

James Duryea, Jr., San Francisco, Cal., for plaintiff.

James K. Barnum, Stammer, McKnight, Barnum & Bailey, Fresno, Cal., Max L. Gillam, Latham & Watkins, Los Angeles, Cal., Robert W. Jordan, Baker & Botts, Dallas, Tex., for defendants Chambers Corp. and Rangaire Corp.

Severson, Werson, Berke & Melchoir, San Francisco, Cal., Rain, Harrell, Emery, Young & Doake, Dallas, Tex., for defendant R & K Distributors, Inc.

## MEMORANDUM DECISION AND ORDER

PRICE, District Judge.

The parties to this action filed multiple motions before the Magistrate, as follows:

1. The motion of defendant R & K Distributors for summary judgment. Timely objections to the Magistrate's recommendation were filed. The Court reviews this motion *de novo*.

2. Plaintiff's motion for summary judgment on its price fixing claim. The Magistrate's recommendation was objected to; hence, the Court reviews *de novo*.

3. Defendant Chambers' motion for summary judgment on plaintiff's antitrust claims. Timely objections were filed to the Magistrate's recommendations; hence, the Court reviews the matter *de novo*.

4. Defendant Amana's motion for summary judgment on plaintiff's antitrust claim. Timely objections to the Magistrate's recommendations were filed. The Court reviews the matter *de novo*.

5. Defendant Chambers' motion for summary judgment on plaintiff's pendent state causes of action. Neither the plaintiff nor the defendants filed timely objections to the Magistrate's recommendations. The Court reviews the Magistrate's recommendations under the clearly erroneous standard.[1]

The Magistrate, although hearing the motions at different times, filed the majority of his recommendations simultaneously. Each motion was addressed separately, although there is a demonstrable relationship among the motions.

### I

### PLAINTIFF'S COMPLAINT

Plaintiff's complaint alleges the following facts which do not appear to be contested:

D & R Distributing (hereinafter D & R) is a California corporation engaged in the wholesale distribution of major kitchen household appliances. It also owns and operates retail appliance stores in Modesto and Fresno. From an unspecified date in 1954, and continuing until October 1, 1980,

1. See *Gonzales v. Harris,* 514 F.Supp. 991 (D.C. 1981).

Chambers Corporation (hereinafter Chambers) a Delaware corporation, and a wholly owned subsidiary of Rangaire Corporation (hereinafter Rangeaire) sold Chambers brand household cooking appliances pursuant to an agreement that was at least partially in writing, and contained a standard form "Franchise Agreement." The complete terms of this agreement are the subject of one of the pending motions.

Prior to the 1973 agreement, D & R had been Chambers' exclusive distributor for Stanislaus, Merced, Fresno, Madera, Kern, Kings and Tulare Counties (the San Joaquin Valley). The 1973 agreement expanded D & R to the whole of Northern California.

The 1973 agreement was terminated October 1, 1980, by Chambers.

Amana Refrigeration (hereinafter Amana), an Iowa corporation, sells Amana brand household and refrigeration appliances nationwide.

R & K Distributors (hereinafter R & K), is a California corporation, which distributes, on a wholesale level, built-in appliance products of various manufacture, including those of Chambers, Rangaire Corporation (hereinafter Rangeaire), a Texas corporation. Rangaire is a building contractor, produces and sells limestone and lime products, and owns all of Chambers' stock. It is not clear from the First Amended Complaint whether Rangaire manufactures and sells appliances independent of its ownership of Chambers.

We turn to the motions.

## II

### THE MOTIONS OF R & K FOR SUMMARY JUDGMENT[2]

The motions of R & K can be properly considered independently of the other motions before the Court.

As pointed out above, the distributorship arrangement between D & R and Cham-

bers was terminated by Chambers on October 1, 1980. R & K is accused by D & R with legal responsibility for this event.

Plaintiff now seeks damage from R & K on account of this termination on the grounds of antitrust violations and a pendent state tort claim.

First, plaintiff claims that its distributorship was terminated by Chambers in violation of the Sherman Antitrust Act "pursuant to and in furtherance of a combination and conspiracy between defendant Chambers Corporation and defendant R & K to unreasonably restrain and unlawfully tie the sale of Chambers brand products with complimentary dominant cooking appliance products, including Jenn-Air and KitchenAid, and pursuant to a combination and scheme to engage in a discriminatory pricing system."

As to the pendent state claim, plaintiff claims that R & K interfered with plaintiff's "prospective economic advantages" under its distributorship agreement with Chambers Corporation by making misrepresentation about the capabilities and intentions of R & K as a prospective distributor of Chambers' products, which induced Chambers Corporation to terminate plaintiff's distributorship.

R & K's presentation has refuted plaintiff's allegations and all reasonable inferences that might be drawn therefrom. When pressed, at deposition or through other discovery devices, for the production of evidence to support these allegations, plaintiff's officers and witnesses have conceded that none exist, save and except an in-house memoranda developed by defendant Chambers' personnel, and distributed only among Chambers' personnel. Presumably, this memorandum was the principal source of information relied upon by the Chambers' executives to choose R & K as the successor distributor to plaintiff. Assuming, without deciding, that such doc-

---

**2.** R & K's original motion was entitled "Motion to Dismiss Amended Complaint." It is based on Fed.R.Civ.P. 12(b)(2), (6). It should be noted that R & K was named in the First Amended

Complaint for the first time. R & K's original motion was denied. R & K then filed the instant motion for summary judgment.

ument would be admissible against R & K under one of the many exceptions to the hearsay rule, we analyze that document to determine its probative effect on the issues tendered by R & K's motion.

*"Advantages Of Having R & K As Chambers Distributor:*

1. Strong position as true distributor of premium priced products—KitchenAid and Jenn-Air.

2. Excellent financial position requiring no factory assistance in warehousing inventory.

3. Strong professional sales force, 11 field salesmen and 50 demonstrators. Experienced management.

4. Over 300 established dealers, long term and loyal.

5. Nationally recognized prestigious distributor who would influence other desirable distributors we would like, such as:

REMCO–Federated—Chicago and Davenport

W.D. Alexander—Atlanta

Dean Distributor—Portland

Domestic Supply—Seattle

Elm Distributors—Denver

Jack Riggs is committed to using his considerable influence to help Chambers secure powerful distributors throughout USA.

6. R & K is committed to opening branch operations in Sacramento and Fresno.

7. R & K is largest Jenn-Air distributor in country and is on record as being committed to Chambers regardless of future moves by Jenn-Air.

8. Experience in selling premium priced cooking equipment, having been large Corning distributor before merger with Amana.

9. Highly professional in their relationship with dealers as shown in exhibits, i.e., franchise agreements, etc.

10. Very promotional with in-house capability. This proposal represents the very best opportunity to improve our market position to date. We suggest a meeting with the R & K organization in San Francisco between our top management and R & K, at the earliest possible date. R & K is prepared to begin as a full operating distributor on October 1, 1980."

Plaintiff first argues that this document supports the inference that R & K made false and fraudulent misrepresentations to Chambers' officials. He points to paragraph 3 concerning the available R & K personnel. As previously indicated, the record indicates clearly that the contents of paragraph 3, as well as other reference R & K's capabilities, represents the interpretation of the Chambers' employees who prepared the memorandum rather than reflecting statements by R & K officers and other employees.

However, for this analysis, even if we assumed that plaintiff's arguments are correct, and further that R & K officers and employees made such statements, would this create a triable issue of fact which would entitle the plaintiff to go to trial?

[1] It is the Court's view that the antitrust elements of this case are controlled by *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302 (9th Cir.1981). There, as here, plaintiff Cox was displaced by defendant distributor Star as the exclusive distributor for truck cranes in the Seattle area which were manufactured by the defendant R & K Products. There, as here, plaintiff sued the replacement distributor as well as the manufacturer, who had replaced plaintiff, on antitrust grounds.

In affirming defendant's motion for summary judgment, the circuit court stated:
... The economic impact resulting from a change in distributors is not altered merely because the dealer initiated contact or actively sought the change, provided the manufacturer ultimately makes the decision based on its independent business judgment. Appellant has advanced no evidence of dealer coercion here, and therefore the attempt to cast this arrangement in horizontal terms must fail.

1296

Under the foregoing principles, appellant cannot prevail because it has failed to adduce any evidence of anticompetitive effect or intent which would distinguish this dealer substitution case from the myriad of decisions upholding changes in distributors. That one distributor will be hurt when another succeeds in taking its line will be axiomatic in some markets, as it was here, but the intent to cause that result is not itself prohibited by the antitrust laws. The intent proscribed by the antitrust laws lies in the purpose to harm competition in the relevant market, not to harm a particular competitor.

*A.H. Cox & Co. v. Star Machinery Co.,* *supra,* at 1307.

To the Court's mind, these principles are determinative of the instant case. Accordingly, it is the decision of the Court to follow the Magistrate's recommendation and to grant R & K's motion for summary judgment on the antitrust theory.

The Magistrate, in his recommendation, did not address the plaintiff's alternate state theory of tortious interference with a prospective economic advantage. Accordingly, the Court considers this theory of recovery *de novo,* reviewing the mass of supporting and opposing material proffered by the parties.

■■■ The tort of interference with prospective advantage consists of intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition. 4 Witkin, Summary of California Law (8th Ed.1974) § 392 at p. 2643. There are five essential components to the tort: (1) an economic relationship containing the probability of future economic benefits accruing to the plaintiffs, (2) defendant's knowledge of the existence of that relationship, (3) defendant's intentional commission of acts designed to disrupt the relationship, (4) actual disruption thereof and (5) damages proximately caused thereby. *Olivet v. Frischling* (1980) 104 Cal.App.3d 831, 837, 164 Cal.Rptr. 87.

■ The critical issue in this tort is whether the interference was justified. In determining this question we must observe an important distinction between interference with a contract and interference with relationships which can be disturbed without a breach of contract. In the case of interference with a contract, it is well established that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. *See Olivet v. Frischling, id.,* n. 1. On the other hand, with the tort of prospective advantage (where inducing a breach of contract is not involved) the law recognizes a more extensive privilege to interfere for the sake of competition. *Shida v. Japan Food Corp.* (1967) 251 Cal. App.2d 864, 866, 60 Cal.Rptr. 43.

■ Plaintiff and defendant agree that liability in this case turns on whether or not the defendant R & K engaged in "improper means" to persuade Chambers to switch to R & K as the distributor. *See Shida v. Japan Food Corp., id.* The use of improper means of persuasion, *i.e.,* fraudulent misrepresentations, would obviate any privilege of fair competition.

In support of its summary judgment motion, defendant introduced deposition testimony that the Chambers Marketing Plan for Northern California was prepared by Mr. Adams and Mr. Pruitt of Chambers, and more importantly, testimony of these two gentlemen that the representations alleged to have been made by defendant R & K were in fact never made. Mr. Adams and Mr. Pruitt testified that the statements which form the basis of plaintiff's allegations against R & K were due to a poor choice of words on the part of Chambers and the statements contained in them, attributable to R & K, were, in fact, never made.

Defendant R & K also submitted deposition testimony of Mr. J. Riggs that he never made any statement to Chambers regarding using his influence to help Chambers secure powerful distributors.

(Depo. J. Riggs, Vol. II, 164:24–28.) However, as to the other representations, Mr. Riggs testified that he does not recall whether or not he made such representations to Chambers. (Depo. of J. Riggs, Vol. II 163:15–16, 25.)

■ Plaintiff contends that defendant has not met its summary judgment burden in that it has not submitted any evidence of its motive or purpose in wooing Chambers. However, it is clear that the movant may discharge its burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for the plaintiff, *Doff v. Brunswick Corp.*, 372 F.2d 801, 805 (9th Cir.1967).

■ The critical deficiency in plaintiff's case on the pendent state cause of action is its lack of any evidence that the defendants committed any acts which were not justified under the general principles of competition. On the basis of the facts developed by the respective parties in support and in opposition to R & K's motion for summary judgment, the case is similar to *Shida v. Japan Food Corp, supra.* There, as here, an exclusive distributorship for a food item was granted to the plaintiff by the manufacturer, said distributorship specifically to be renewable on an annual basis. During the seven successive renewals, plaintiff increased its production by approximately 400 percent. At the behest of defendant, plaintiff's manufacturer did not renew its contract with the plaintiff. In reversing the bench judgment for the plaintiff, the appellate court stated:

> In the case at bench it appears from the findings of the trial court that the award of damages rests exclusively upon the assumption that it was an actionable wrong to induce Waimanalo Ko-Ko Company not to renew its agreement with plaintiff. There is no finding that defendant used any improper means to persuade Waimanalo, or that any illegal restraint of competition was created, or that defendant had any purpose beyond

the obvious objective of advancing its own interest as a competitor.

*Shida v. Japan Food Corp, supra,* at 867.

It should be noted that the instant motions for summary judgment are before the Court only after extensive discovery has been undertaken. This is not a case wherein the plaintiff has not had ample opportunity to probe all of the hidden recesses of its corporate opponents in order to discover evidence from which inferences favorable to its position might be drawn. It is not been able to develop even a scintilla of such evidence.[3]

With the antitrust claims against R & K removed from the action, an alternate ground for granting R & K judgment on the pendent state claims is lack of jurisdiction in this Court, once the federal claims are gone. We have two California corporations proceeding against each other on a state cause of action which is not so interwoven with the remaining issues to cause the Court to retain its discretionary jurisdiction.

### III

### CHAMBERS AND RANGAIRE'S MOTION FOR SUMMARY JUDGMENT

A. *Plaintiff's Claims Based Upon Defendants' "Refusal to Deal"*[4]

Paragraphs 22 and 22A are the basis of plaintiff's allegations in this regard. They read:

> "In August, 1980, defendant Chambers Corporation refused to deal and terminated plaintiff as the exclusive direct purchaser and primary distributor of Chambers brand products in Northern California and Western Nevada pursuant to and in furtherance of a combination and conspiracy between defendant Chambers Corporation and defendant R&K Distributors, Inc. to unreasonably restrain and unlawfully tie the sale of Chambers brand products with complimentary dominant cooking appliance products, includ-

---

3. See the Court's comments concerning the Chambers in-house memorandum, *supra,* which analysis is equally relevant here.

4. The Court adopts a "compartmentalized" approach to this motion.

ing Jenn-Air and Kitchen Aid, and pursuant to a combination and scheme to engage in a discriminatory pricing system. Said combination and conspiracy violates Section 1 and 2 of the Sherman Act, 15 U.S.C. 1,2." (Paragraph 22)

"On or about August 15, 1981, defendant Chambers Corporation refused to deal with, and terminated plaintiff as the exclusive factory distributor in Northern California and Western Nevada for Chambers brand products. Said refusal to deal and termination was accompanied by anticompetitive intent. Said refusal to deal and termination produced anticompetitive effects. Said refusal to deal violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2." (Paragraph 22A)

The moving defendants invite us to assume the truth of these allegations and to grant their motion as a matter of law.

The defendant then cites the usual compilation of distributorship cases to buttress its position. The plaintiff, on the other hand, cites cases that have at their nexus strong evidence of price fixing [*Lessig v. Tidewater Oil Co.* 327 F.2d 459 (9th Cir. 1964)], refusal to deal as formerly after acquisition of a competitor [*California Steel and Tube v. Kaiser Steel Corp.*, 650 F.2d 1001 (9th Cir.1981)], where the evidence established an anti-competitive effect or purpose [*Fount-Wip, Inc. v. Reddi-Wip*, 568 F.2d 1296 (9th Cir.1978), and *Program Engineering v. Triangle Publication*, 634 F.2d 1188 (9th Cir.1981)]. Thus, the plaintiff does not meet defendants' legal contentions that Chambers' unilateral refusal to deal with D & R, without more, does not state a claim under the Sherman Act.[5]

B. *Plaintiff's Allegation That Chambers' Refusal to Deal was Accompanied by "Anti-Competitive Intent" and Produced "Anti-Competitive Effects."* (Paragraph 22A, Plaintiff's Amended Complaint.

*Sierra Wine and Liquors v. Heublein, Inc.*, 626 F.2d 129, 133 (9th Cir.1981), states the rule to be:

"Nor is United liable for violation of Sherman § 1. A manufacturer which switches distributorships violates antitrust laws only if 'the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade.' *Alpha Distrib. Co. of Cal., Inc. [v. Jack Daniel Distillery]* 454 F.2d [442] at 452. *See Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620 (9th Cir.1977); *Joseph E. Seagram & Co., Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 77–78 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Again, 'combination or conspiracy' is a necessary condition of liability, and the district court was correct in finding, on the facts before it, that there was neither."

On the other hand, *California Steel and Tube v. Kaiser Steel Corp.*, *supra*, at 1003–1004, teaches that:

"A unilateral refusal to deal may violate the Sherman Act if it is accompanied by anti-competitive acts or purpose. *Times-Picayune v. United States*, 345 U.S. 594, 625, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953). Such a refusal may constitute an unreasonable restraint of trade even if it is justified by legitimate business reasons. *Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1195 (9th Cir.1980)."

And, again:

"The elements required to establish a claim of attempt to monopolize in this circuit have been variously stated, but generally plaintiff must show: (1) specific intent to destroy competition, (2) predatory conduct directed to accomplishing that purpose, and (3) dangerous probability of success. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978);

---

5. We have already dealt with the claim of conspiracy between Chambers and R & K. (See part I, *supra*.)

*Hallmark Industry v. Reynolds Metals Company*, 489 F.2d 8, 12–13 (1973) cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). These elements need not be established independently.

■ The Court agrees with the defendants' statement of the law. It is clearly the law of the Circuit that:

" 'It has been consistently held in this circuit that it is not a violation of the Sherman Act for a manufacturer to conspire with others to simply switch distributors at one of its exclusive francises and to cease doing business with the former dealer.' *Golden Gate Acceptance Corp. v. General Motors Corp.*, 597 F.2d [676] at 678; *Marquis v. Chrysler Corp.*, 577 F.2d 624 (9th Cir.1978); *Dreibus v. Wilson*, 529 F.2d 170, 172–74 (9th Cir.1975); *Bushie v. Stenocord Corp.*, 460 F.2d 116, 120 (9th Cir.1972); *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 452 (9th Cir.1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd,* 416 F.2d 71, 78 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). That the termination of dealings may affect the entity refused is immaterial when the refusal is 'for business reasons which are sufficient to the manufacturer in the absence of any arrangement restraining trade.' *Bushie v. Stenocord Corp.*, 460 F.2d at 119. *Chandler Supply Co. v. GAF Corp.*, 650 F.2d 983, 989 (9th Cir.1980).

Were this a case where the prior relationship had not been that of a distributor-supplier, D & R's allegations in Paragraphs 22 and 22A may have been sufficient as a matter of law. Since we have already resolved the only conspiracy issue raised by the pleadings in D & R's Sherman Act § 1 claims, the Court finds Chambers and Rangaire are entitled to summary judgment thereon.

C. *D & R's Sherman Act § 2 Claims.*

At the outset, we note that defendants point to the Magistrate's failure to address their motion as to D & R's § 2 claims. Since we review the Magistrate's recom-

mendations *de novo*, this omission, if it did occur, is not material to our consideration.

■ Section 2 of the Sherman Act is violated when a refusal to deal is used as leverage to maintain or extend the trader's monopoly power, or in an attempt to monopolize some part of the market place. 1 Von Kalinowski, Antitrust Laws and Trade Regulation ¶ 2.03(2)(a) at p. 2–31. D & R designates this claim as an attempt to monopolize.

■ The phrase "attempt to monopolize" means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it. Although the completed offense of monopolization under Section 2 only requires a general intent to do the acts leading to a monopoly, a specific intent to destroy competition or build monopoly is essential to liability. *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 813 (9th Cir. 1976).

■ There are three necessary elements of an attempt to monopolize claim. The first is the presence of a specific intent to destroy competition or build a monopoly. Such an intent may be shown or inferred by the commission of a Section 1 violation (e.g., in *Lessig v. Tidewater Oil Co, id.,* the court found Section 1 violation consisting of defendant's resale price fixing and exclusive dealing). Alternately, such intent may be shown through proof of the specific intent to set prices or exclude competition in a portion of the market without legitimate business purpose. *Hallmark Indus. v. Reynolds*, 489 F.2d 8, 12 (9th Cir.1973). Second, the specific intent must be accompanied by either (1) predatory or anticompetitive conduct or a substantial claim of restraint of trade directed to accomplishing the unlawful purpose, or (2) sufficient market power to accomplish the unlawful purpose. Kintner, Federal Antitrust Law, § 13.4 at p. 425 and see *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir.1980). Third, there must be

causal antitrust injury. *Cal. Computer Products v. Intern. Business Machines,* 613 F.2d 727, 738 (9th Cir.1979).

Unilateral refusals to deal, in conjunction with these requisite elements, have been held to constitute an attempt to monopolize in violation of § 2 of the Sherman Act. *See* Kintner, Federal Antitrust Law, Vol. II § 10.25 at p. 148. D & R alleges all three in its amended complaint.

■ On a motion for summary judgment by a defendant on the ground that plaintiff has no valid claim, the defendant, as the moving party, has the burden of producing evidence, of the necessary certitude, which negatives the opposing party's claim, regardless of where the ultimate burden of proof would lie at trial. *National Industries v. Republic Nat. Life Ins. Co.,* 677 F.2d 1258, 1265 (9th Cir.1982) and generally, 6 Moore's Federal Practice ¶ 56.-15(3) at p. 56–480.

However, Chambers-Rangaire assert that they accept for purposes of the summary judgment motion that all of D & R's factual assertions are true; that despite the truth of all the facts asserted by plaintiff, summary judgment should be granted, essentially, because plaintiff has failed, under any reasonable construction of the undisputed facts, to support a claim under Section 2 of the Sherman Act as a matter of law.

D & R's Answer is predictable; it is the burden of the moving party to demonstrate the absence of a genuine issue as to any material fact, and since Chambers-Rangaire offer no evidence, D & R is entitled to the Court's judgment on this point. This analysis overlooks the fact that Chambers-Rangaire rest not on what they can prove, but rather, on the basis that the facts marshalled by D & R on this issue are not sufficient, *as a matter of law,* to go to the jury.

■ The Court concurs with Chambers-Rangaire and grants their motion for summary judgment as to plaintiff's claims based on § 2 of the Sherman Act.

## IV

### PRICE DISCRIMINATION CLAIMS

■ Plaintiff's Robinson-Patman Act claim, 15 U.S.C. § 13 reads as follows:

"Beginning sometime in 1975, or earlier, the exact date being presently unknown to plaintiff, defendant sold built-in household cooking appliances of its own manufacture, which products were of like grade and quality to Chambers brand built-in household cooking appliances to Amana Corporation; Sears, Roebuck & Co.; and Roper Corporation, among others, at different and lower prices than the prices at which defendant sold the same products under the Chambers brand name to plaintiff. Said unlawful price discrimination violates Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13."

After reviewing the Magistrate's recommendation and the evidence presented by the parties, it appears to this Court that the Magistrate was correct in determining that there is a genuine issue of fact regarding the question of "like grade and quality" which must go to the jury. However, this determination does not end the Court's inquiry.

The defendant argues that even if the private label ovens sold to Amana were of "like grade and quality" as the Chambers-brand ovens, it is still entitled to summary judgment because the price differentials between the two types of ovens were not discriminatory. Alternately, defendants assert that even if the price differentials were discriminatory, they did not substantially injure, destroy or prevent competition. Finally, they contend that even if the price differentials were discriminatory and did substantially injure, destroy or prevent competition, they did not cause compensible injury to plaintiff and thus defendant is entitled to summary judgment on the price discrimination claim.

The defendants buttress their position by contending that had plaintiff requested the manufacture of the private label ovens it

would have received them at the same price Amana did.

The resolution of this issue however turns on the resolution of the question of "like grade and quality" and since there is a factual issue remaining as to like grade and quality, the question of the price differentials being nondiscriminatory cannot be resolved at this stage of the proceedings. If for example the products are in fact of like grade and quality, then the private label arrangement is merely a facade behind which defendant hides so that it might charge different prices to different customers. The fact that plaintiff could have also benefitted from such a facade does not demonstrate that such an arrangement is not discriminatory as a matter of law.

Plaintiff must demonstrate at trial that the alleged price differential tended, substantially, to lessen or injure competition. Defendant argues that plaintiff's answer to interrogatories in which plaintiff was asked what facts it relied on to establish that the price differentials substantially injured or lessened competition, is insufficient to prove injury to competition and thus defendant is entitled to summary judgment.

Plaintiff's evidence shows that Mr. Watters, a research analyst of Chambers, testified both: 1) that he felt Chambers distributors were at a competitive disadvantage against Amana (Depo. 14:18–22), and 2) that they *weren't* at a competitive disadvantage. (Depo. 13:11–18).

If the question of substantial injury of competition alone were the critical issue, summary judgment would be denied in light of the dispute as to whether or not such injury existed. However, the critical question in a third line injury case such as plaintiff alleges here is whether or not the favored purchaser (Amana Refrigeration) actually passed on part of the discount given it by Chambers to Amana West Coast. *See* Von Kalinowski, *id.*, § 5.07[2].

Defendant argues that plaintiff "has simply adduced no evidence to support its conclusion that ... any lower price offered by Amana [Refrigeration] was the result of

the price differentials upon which plaintiff bases its claim." However, defendant does not point to any interrogatory or deposition in which such information was sought and not given by plaintiff.

Finally, defendant argues that even if the discriminatory price differentials substantially injured competition, it is entitled to summary judgment because such price discrimination did not cause compensible injury to plaintiff. A private treble damage plaintiff "must make some showing of actual injury attributable to a violation of the Robinson-Patman Act. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

However, plaintiff's answer to Chambers interrogatories indicates that plaintiff lost sales to its retail dealer customers including nine specified customers due to the discriminatory price differentials allowed by defendant. If such loss of sales is true, plaintiff will have sufficiently met its damage requirements for a § 2(a) violation. See *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 22 (1981).

Consequently, defendant's motion for summary judgment as to plaintiff's Robinson-Patman Act claim is denied.

## V

### PLAINTIFF'S MOTION BASED ON DEFENDANT CHAMBERS–RANGAIRE EXCLUSIVE DEALING ARRANGEMENT

Paragraph 19 of plaintiff's amended complaint alleges:

"Beginning sometime in 1977 and continuing until August 15, 1980, defendant Chambers Corporation coerced plaintiff into contracts, combinations and conspiracies to prevent competition in the manufacture, distribution and sale of products manufactured and sold by actual and/or potential competitors of defendant Chambers Corporation and/or defendant Rangaire Corporation. By said unlawful contracts, combinations and conspiracies,

plaintiff was coerced, on threat of termination and refusal to deal, to refrain from purchase of household cooking appliances other than Chambers brand products for wholesale distribution by plaintiff. Said contracts, combinations and conspiracies violate Section 1 and Section 2 of the Sherman Act, 15 U.S.C. 1, 2."

Paragraph 20 of plaintiff's amended complaint alleges:

"Beginning sometime in 1973 and continuing up to October 1, 1980, defendant made sales of Chambers brand household cooking appliances to plaintiff on the condition, agreement and understanding that D & R Distributing would commit itself not to purchase or deal at wholesale in household cooking appliances of any manufacturers of kitchen appliances or any other actual or perceived competitor of Chambers Corporation and/or defendant Rangaire Corporation. Defendant thereafter policed the exclusive dealings arrangement by requiring and inducing plaintiff to refuse to distribute at wholesale any household cooking or other appliances other than Chambers brand products, and further, by extracting commitments that plaintiff would forbear from becoming the exclusive distributor for household appliance products other than Chambers brand products. Said unlawful contreact [sic] violates Section 1 of the Sherman Act, 15 U.S.C. 1, and Section 3 of the Clayton Act, 15 U.S.C. 14."

Plaintiff asserts that paragraphs 19 and 20 allege alternative substantive antitrust rules: # 19 alleges a group boycott by plaintiff and defendants against competitors of defendants; # 20 alleges an exclusive dealings arrangement between itself and defendant whereby plaintiff would refrain from distributing products of defendant's competitors.

In support of its contention that paragraph 19 alleges a traditional group boycott, per se violation of the antitrust laws, plaintiff directs the court's attention to its response to defendant's interrogatory no.

3(g), wherein plaintiff explains its per se allegations to the defendant:

"The violation set forth in paragraph 19 constitutes a per se violation of the Sherman Act. The enlistment by Chambers Corporation, through coercive threats, of a third party, here the plaintiff, in an agreement not to trade with a manufacturer who competes with Chambers Corporation' comprises a boycott, condemned under the Sherman Act. [citations] Traders may not exclude or inhibit a competitor trying to enter or compete in a market by coercing or inducing a customer not to deal with the competitor. [citations] Under the facts recited above, and incorporated herein by this reference, Chambers Corporation enlisted and induced plaintiff, an independent entity, on threat of termination, not to trade with competitors of Chambers Corporation, namely, Kelvinator Company, Gray and Dudley, and Roper Corporation."

It is evident from plaintiff's papers in opposition to the summary judgment motion and plaintiff's responses to interrogatories that paragraph 19 is aimed at two injuries: (1) a group boycott against defendant's manufacture-competitors and (2) loss of business from competing manufacturers.

■ Defendant's challenge to the first type of injury, viz., the group boycott involving plaintiff and defendant raises a question of standing. Standing is a question of law to be decided by the court. *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir.1977).

The Ninth Circuit has established the "target area" formula for determining standing. Under this doctrine, one who is only incidentally injured by a violation of the antitrust laws, "the bystander who was hit but not aimed at," cannot recover against the violator. *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir.1955).

It appears clear to this court that D & R Distributing does not have standing to as-

sert the injuries of defendant's competing manufacturers.

The second injury plaintiff complains of in ¶ 19 is its own loss of business from competing manufacturers, specifically, Kelvinator Company, Gray and Dudley and Roper Corporation, allegedly caused by defendant's exclusive dealing arrangement. However, this injury is more appropriately and clearly encompassed in ¶ 20.

Accordingly, the Court orders summary judgment for Chambers-Rangaire as to Paragraph 19 of plaintiff's amended complaint.

Paragraph 20 of plaintiff's amended complaint alleges an exclusive dealing arrangement between itself and defendant in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiff has withdrawn its assertion of a violation of the Clayton Act. It now proceeds only on its alleged § 1 of the Sherman Act violation.

■ In order to succeed with its § 1 claim at trial, plaintiff must demonstrate that an exclusive dealing arrangement exists, and that the performance of such an arrangement or contract will foreclose competition in a substantial share of the relevant product and geographic markets. Antitrust Adviser, 2d Ed. § 2.3 at p. 85 and *see Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274–1275 (9th Cir.1975) (although Court addresses § 3 of Clayton Act, it is equally applicable to § 1 of the Sherman Act).

Essentially, defendant's argument is as follows: 1) plaintiff has failed to establish the existence of an exclusive dealing arrangement; 2) even if plaintiff has established an exclusive dealing arrangement, it has failed to adequately define the relevant market; but, 3) even if plaintiff has established the exclusive dealing arrangement and has adequately defined the relevant markets, it has failed to "adduce(d) any evidence that the alleged exclusive dealings arrangement or any other alleged restraint of trade had an adverse effect upon a substantial portion of the relevant market.

■ Initially, the Court notes that the defendants have failed to introduce any evidence regarding the existence or nonexistence of an exclusive dealing arrangement for the time period involved in this lawsuit. Defendant's evidence to the effect that defendant thought that plaintiff would be unable to handle its large distribution area if it took on other manufacturers' products or the fact that in the past plaintiff did in fact distribute products for other manufacturers adds nothing to the question of the existence or abuse of an exclusive dealing arrangement. The defendants have failed to demonstrate that there is no genuine issue as to the existence or nonexistence of this critical fact.

Next, defendant argues that plaintiff has failed to adequately define the relevant markets. However, plaintiff's answers to interrogatories indicate that the relevant geographic market is Northern California and the relevant product markets are 1) electric built-in ovens, 2) electric built-in cooktops, and 3) 42-inch gas built-in cooktop surface units. Defendant may believe that to classify the product markets in the way in which plaintiff has done is "absurd", but that is insufficient support for its summary judgment motion.

Finally, defendant is correct that *at trial* plaintiff must prove that the exclusive dealing arrangement foreclosed competition in a substantial share of the relevant markets. The court recognizes that the defendant could sustain its summary judgment burden by conclusively showing that all the material facts are in evidence and that under no interpretation of such facts could the plaintiff demonstrate the foreclosure of competition in a substantial share of the relevant markets. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Before defendant would be entitled to summary judgment, however, it must demonstrate that all the evidence is in and with it, plaintiff cannot prove that competition in the relevant markets was foreclosed as a result of the alleged exclusive

dealing arrangement. Defendant has not done this.

Accordingly, defendant's motion for summary judgment as to plaintiff's exclusive dealings claim as alleged in Paragraph 20 is denied.

## VI

### PLAINTIFF'S GROUP BOYCOTT CLAIMS

Paragraph 23 of plaintiff's complaint states:

"Beginning sometime in November 1980, or eaerlier [sic], the exact date being unknown to plaintiff, defendant entered into and carried out contracts, combinations and conspiracies to restrain interstate trade and commerce in the relevant market by effectuation of group boycotts depriving plaintiff of Chambers brand products from interstate sources of supply including Acropolis Wholesale Lumber of Salt Lake City, Utah; Designer Kitchens of Pohoenix, [sic] Arizona; Shreiber Engineering of Los Angeles, California; and ADD Distributors of Omaha, Nebraska. Said contracts, combinations and conspiracies violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. 1, 2."

■ A group boycott is a restraint which generally is the means used for effectuating a concerted refusal to deal. Horsley, Per se Illegality and Concerted Refusals to Deal, 13 B.C. Indus. & Com.L. Rev. 484 (1972), found at n. 500 in Kintner, § 10.28 p. 155. An essential element to a group boycott claim is concerted action. Kintner: Federal Antitrust Law, Vol. II, at §§ 10.27–10.38.

The concerted action alleged by plaintiff was between C & R and each participant listed in paragraph 23 of plaintiff's complaint, viz., Acropolis Wholesale Lumber of Salt Lake City, Designer Kitchens of Phoenix, Shreiber Engineering of Los Angeles, and ADD Distributors of Omaha.

Initially, defendants C&R argue that all the alleged participants to the group boycott claim, in their respective depositions,

have stated that they chose not to do business with plaintiff because of business reasons, i.e., insufficient profit, and not due to any group boycott intentions or actions on the part of defendants C & R. Defendants' position is that since there is no concerted action and more importantly, no genuine issue of fact as to the existence of any concerted action, plaintiff's group boycott claim must fail and the court should grant summary judgment.

However, plaintiff has introduced evidence demonstrating that a factual question regarding the existence of concerted action among Chambers and at least one of the participants designated in paragraph 23 of his complaint exists.

Gary Bateman, the employee of the owner of Acropolis Wholesale Lumber and the one who is responsible for its purchasing, testified in his deposition that the vice-president of Chambers Corp. called and asked if a particular shipment ordered by Acropolis was intended for delivery to California and if so, Chambers Corp. wanted Bateman to know that two prior attempts to place such an order had already been made, and, although Chambers could not prevent Acropolis from making any such sale and delivery, it would prefer that Acropolis not make the particular shipment. (Deposition of Gary Bateman, 78:5–88.) On the other hand, Gary Bateman also testified that Dick Paras, the manager of Acropolis Wholesale Lumber, decided not to make the sale because, in addition to freight charges and the hassle with Chambers, no money would really be made on the sale. (Deposition of Gary Bateman, 111:9–13.)

■ The Court concludes that plaintiff has demonstrated a genuine issue of material fact, sufficient to withstand the motion for summary judgment, as to whether Acropolis Wholesale Lumber of Salt Lake City, Utah, was involved in "concerted action" with defendant or made a legitimate business decision.

Defendant next posits that the per se rule of unreasonableness is not applicable in the instant case because the alleged

group boycott is pursuant to a vertical restraint which would be governed by the Rule of Reason analysis.

Defendant argues that since plaintiff declared that it was proceeding with a per se case and not a rule of reason, once it is determined that a per se analysis is not applicable, plaintiff cannot choose to proceed with a rule of reason analysis. Defendants cite no authority for this proposition. There are cases where the court of appeals declined to proceed with a rule of reason analysis based on a *stipulation* to such effect between the parties and not any established rule of law. Plaintiffs would not be precluded from proceeding with their claim under a rule of reason analysis were the per se rule deemed to be inapplicable.

The law regarding concerted refusals to deal, or group-boycotts, is currently unsettled. One court discussing group boycotts noted "to state that the law concerning group boycotts and Section 1 of the Sherman Act lacks consistency would be to understate the truth by a wide margin." *Cullum Electric and Mechanical Inc. v. Mechanical Contractors Assn.*, 436 F.Supp. 418 (1976), *aff'd* 569 F.2d 821 (4th Cir.1978). Conduct identified as a group boycott is no longer automatically considered as per se illegal, at least by the lower courts. Kintner, *id.* § 10.31 at p. 169. Some courts will examine whether the parties involved in the concerted refusal to deal are horizontally or vertically integrated, applying the rule of per se illegality to the former and the rule of reason to the latter. See cases cited in *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1381–1388 (9th Cir.1981).

The classification of agreements as between horizontally integrated businesses, i.e., agreements between competitors at the same level of market structure such as among manufacturers, or among distributors), and agreements between vertically integrated businesses i.e., agreements between persons at different levels of the market structure such as manufacturers and distributors, is however not always sufficiently informative or conclusive. See, e.g., *Cernuto Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir.1979) [agreement typically vertical, i.e. between a manufacturer and its distributor, judged by per se rule of illegality because, where agreement initiated by distributor the restraint was primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier and for purpose of controlling prices.]

Commentators in the field of antitrust law suggest that courts analyze the reasons underlying the concerted refusals to deal to determine whether they are exclusionary or anticompetitive and whether the particular practice in question is at least potentially reasonably ancillary to joint, efficiency-creating economic activities. Antitrust Advisor, 2d Ed., Supp. § 1.32 at pp. 36–46 and cases cited therein. The basic inquiry should be whether there is some plausible likelihood that the arrangement at hand has an efficiency-creating potential. If it does, it should be analyzed under the rule of reason. If not, per se illegality is appropriate. Antitrust Adviser, id., Supp. at p. 47.

After reviewing the papers in support of and in opposition to defendant's motion for summary judgment, this Court concludes that the defendants have failed to submit sufficient evidence from which a determination as to whether the per se rule of illegality or the rule of reason should be applied to the instant case can be made. Accordingly, defendant's motion for summary judgment on that issue is denied.

## VII

### PLAINTIFF'S PRICE FIXING CLAIM AGAINST DEFENDANTS CHAMBERS AND AMANA REFRIGERATION

Paragraph 18 of plaintiff's First Amended Complaint alleges:

Beginning on January 5, 1977 and continuing at least to the time this complaint was filed, Chambers Corp. and Amana

Refrigeration entered into and carried out a contract, combination and conspiracy to fix, stabilize, peg, control and regulate prices on sales of self-cleaning pyrolytic electric built-in wall ovens and other built-in kitchen appliance products sold under Amana and Chambers brand names. Said contract, combination and conspiracy unreasonably restrained interstate trade and commerce in California and in the U.S. in violation of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

Plaintiff's theory is that defendants Chambers Corporation and Amana agreed to an exchange of distributor price lists with the intent of fixing prices.

■■■ Generally, the mere compilation and dissemination of pricing information among competitors does not constitute a per se violation of the Sherman Act. *United States v. United States Gypsum Co.,* 438 U.S. 422, 441, 98 S.Ct. 2864, 2875, n. 16, 57 L.Ed.2d 854, 872, n. 16 (1978), *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (Fortas concurring) (1969), *Krehl v. Baskin Robbins Ice Cream Co.,* 664 F.2d 1348, 1357 (9th Cir. 1982), *Rutledge v. Electric Hose & Rubber Co.,* 327 F.Supp. 1267, 1272 (C.D.Cal.1971), and *see* discussion in Kintner, *Federal Antitrust Law,* Vol. II, §§ 10.2–10.14. However, an exchange of price information coupled with a restriction of output or otherwise specific actions designed to achieve a uniformity of prices among competitors would constitute a per se violation of the Sherman Act. *United States v. American Linseed Oil Co.,* 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923), *Krehl, id.,* and *Morton Salt Co. v. United States,* 235 F.2d 573, 576–577 (10th Cir.1956), and *United States v. Citizens National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41, 62 (1975).

■■■ Defendants correctly point out that mere price similarity, when faced with identical or similar products involving similar costs necessarily requiring somewhat similar prices, standing alone, would be too insubstantial a foundation to support an inference of an unlawful price fixing conspiracy. *See Krehl, supra,* at p. 1357, n. 22. This clearly falls short of the type of conduct accompanying price information exchange which courts have found to be per se illegal. *See, e.g., United States v. American Linseed Oil Co., supra.* However, the ultimate test is not only what the actual effect is on prices, but whether such agreements interfere with "the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Plymouth Dealers' Ass'n. of No. Cal. v. United States,* 279 F.2d 128, 132 (4th Cir.1960).

Plaintiff relies on its evidence of an agreement between Chambers/Rangaire and Amana to exchange prices as the sole justification for concluding that defendants committed a per se violation of the Sherman Act. This is clearly not the law and plaintiff fails, as a matter of law, in its attempt at summary judgment. The Court concludes that the Magistrate was correct in denying plaintiff's cross-motion for summary judgment.

## VIII

## DEFENDANT CHAMBERS MOTION RE PRICE FIXING

However, the court notes that defendants, in support of their motion for summary judgment on plaintiff's price fixing claim, introduce evidence that one of Amana's executives responsible for setting the price of its ovens never examined or perused Chambers' price list, but, rather, fixed the price of its ovens by determining the cost of production and then adding a percentage profit figure to this amount. (Affidavit of George Tolbert). However, Mr. Tolbert's superiors to whom he sent his final prices for approval have not declared that they never saw the Chambers' price list or used it in finally determining Amana's price structure. Although defendant's counsel argues in its brief that Chambers' executives and departments responsible for price setting used the same procedure and did not examine Amana's price list, there is

no evidence of this presented to the Court for its consideration.

Rather, Mr. O.E. Pritchard, the Cost Manager for Chambers and the person who was responsible "for determining the standard cost of production of ovens sold by Chambers to its regional distributors under the Chambers brand states that, "I was periodically requested by my superiors at Chambers to determine the standard cost of [the ovens in question] for use in determining the price to be charged by Chambers for such ovens." Then, in his affidavit, Mr. Newton of Chambers testified that Mr. Hill or Mr. Grimes of Chambers determined what percentage of profit Chambers wanted to receive on its ovens. Nowhere does Chambers introduce evidence that the price list of Amana was not used or considered in effecting Chambers' own prices.

 All inferences to be drawn in a summary judgment motion must be drawn in favor of the non-moving party. The movant must make a showing that makes it quite clear what the facts are as established by the evidence, and that excludes any real doubt as to the existence of any genuine issue of material fact. 6 *Moore's*, ¶ 56.15[3], at pp. 56–466—56–473. If the executives at Chambers who are responsible for establishing and finalizing the price to its distributors, in fact, examined and considered Amana's price lists in determining their own prices, the jury would be entitled to decide that an agreement to regulate, stabilize or otherwise fix prices did in fact exist. Such an inference by the fact finder would entitle plaintiff to a "per se" finding of antitrust liability.

Defendants argue, alternately, that even if the plaintiff prevails on the issue of liability, plaintiff has presented no evidence of injury in fact, or, alternately, any evidence from which plaintiff's damage might be computed.

 The antitrust plaintiff may recover three types of damages: (1) Its increased costs, (2) lost past profits, and (3) reduction in the value of his business. Antitrust-Treble Damages—Injury, 16 A.L.R.Fed 14, 19.

Of course, double recovery is not allowed, *id.* In the instant case, it appears that plaintiff seeks to recover its increased costs in the form of overcharges for the fixed-price items, or, alternately, its lost net profits measured by the "before and after" method.

Defendant posits that there is only one proper type of recovery—that of increased costs measured by the amount of overcharge for the fixed item. Although this is generally considered the most simple method of fixing damages, (Antitrust Adviser, 2d Ed., § 12.50 at p. 899) it is not the exclusive remedy. *See Washington State Bowling Prop. Ass'n v. Pacific Lanes, Inc.*, 356 F.2d 371, 379 (9th Cir.1966), *cert. denied* 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674, and 16 A.L.R.Fed. at p. 19.

 Commonly, the increased cost damages involve a price overcharge. Where illegal price fixing results in an artificially high price, those who pay the fixed price may recover the difference between the fixed price and the price which would otherwise have prevailed absent the illegal price fixing. 16 A.L.R.Fed. 19; *Chattanooga Foundry and Pipe Works v. Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906); and *Thomsen v. Cayser*, 243 U.S. 66, 88, 37 S.Ct. 353, 360, 61 L.Ed. 597 (1917). And, although determining what the price would have been absent a conspiracy may require some speculation. A wrongdoer should not be permitted to invoke the uncertainty created by his own wrong and use it to preclude a plaintiff's recovery. *National Constructors v. National Elec. Contractors*, 498 F.Supp. 510, 518, 538 (D.Md.1980).

Recovery of lost profits is measured in any of three ways: The "before and after" method, the "yardstick method," or the "sales projection" method. 16 A.L.R.Fed. 20. Plaintiff states that it has chosen the "before and after" method.

The "before and after" method compares two periods of time in the antitrust claimant's business—the period during which his business suffered from the antitrust violations, and a previous or subsequent period

free from the effect of the antitrust violations. Specifically, the claimant is awarded the difference between, (1) his net profits during a period either before the antitrust violations began or after they had ceased and their effects had ended, and (2) his net profits during the period of the antitrust violations. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), and 16 A.L.R.Fed. 21. The period used for comparison with the damage period must be a fair measure of the claimant's profits. 16 A.L.R.Fed., *id.* The Ninth Circuit has held that the before and after method of measuring damages may be used only where there has been some showing that the market conditions in the two periods were similar but for the impact of the violation. *Pac. Coast Agri. Export Ass'n. v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1206–1207 (9th Cir.1975).

Plaintiff asserts that the "starting point for computing the overcharge extracted from plaintiff and other direct purchasers during the period of the price fix" is the 41.5% profit margin of Chambers and the 26% profit margin of Amana. Plaintiff then correctly points out the relevant inquiry: "The issue then is to determine what the price in a free and open market would have been but for the artificial price-fix imposed on the market by Chambers and Amana."

First, the margin of profit received by defendants, while relevant, is not determinative. Plaintiff would need to demonstrate that, at a minimum, the margin of profit was appreciably different during the period of antitrust violation than during the periods of no antitrust violation. Plaintiff says nothing more than is mentioned above. Nor, in its answers to interrogatories, does plaintiff do more than to mention what the range of profit margin of defendants was—without indicating any specific time period for purposes of comparison.

More importantly, the difference between the price charged to plaintiff and defendants' marginal cost of production, without more, is not necessarily relevant nor necessarily indicative of what the "overcharge" was. Granted, in a free, ideally competitive market, often prices will not be much greater than the marginal cost of production. And true, in some monopoly cases, the fact that prices are much greater than the marginal cost of production is some indication of control over prices. However, it is necessary to know more than defendants' mere marginal cost of production. One can be competitive and still be able to charge more than the marginal cost of production—assuming the market will bear it.

In summary, defendants' position is that all of plaintiff's evidence, as demonstrated by its answers to interrogatories, fails to present evidence of damages.

Implicit from the facts given in plaintiff's answers regarding the issue of damages is that the "free market, non-fixed price" during the antitrust violation period is evidenced by the price Chambers sold the relevant products to Amana, which price is less than it sold the same products to D & R.

Granted, plaintiff could have given more complete answers to defendants' interrogatories, but for purposes of this summary judgment motion, in view of the fact that all inferences must be drawn in plaintiff's favor, plaintiff has some evidence of injury and some evidence from which the jury could calculate the amount of damages.

Plaintiff does not mention its use of the "before and after" method of calculating damages in its answers to interrogatories.

Accordingly, it is ordered that:

1. Plaintiff's Motion for Summary Judgment on the Sherman Act claims is denied, and

2. Defendant Chambers' and Amana's Motions for Summary Judgment on the plaintiff's price fixing claims are likewise denied.

Counsel for the moving defendants are to prepare and lodge with the Court *separate* judgments consistent with this Memorandum Decision and Order and lodge the same within twenty (20) days of the date of this Order. Counsel for the plaintiff shall

have twenty (20) days to object to the *form* of such judgments.